GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER (*pro hac vice forthcoming*)
 OSnyder@gibsondunn.com
MYLAN L. DENERSTEIN (*pro hac vice forthcoming*)
 MDenerstein@gibsondunn.com
KATHERINE MARQUART, SBN 248043
 KMarquart@gibsondunn.com
KARIN PORTLOCK (*pro hac vice forthcoming*)
 KPortlock@gibsondunn.com
LEE R. CRAIN (*pro hac vice forthcoming*)
 LCrain@gibsondunn.com
CASSARAH M. CHU (*pro hac vice forthcoming*)
 CMChu@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.4000
Fax: 212.351.4035

GRETA WILLIAMS, SBN 267695
 GBWilliams@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202.955.8500
Fax: 202.467.0539

LAUREN M. BLAS, SBN 296823
 LBlas@gibsondunn.com
COURTNEY M. JOHNSON, SBN 324331
 CJohnson2@gibsondunn.com
LENORE H. ACKERMAN, SBN 324995
 LAckerman@gibsondunn.com
MACKENZIE A. MCCULLOUGH, SBN 324343
 MMcCullough@gibsondunn.com
333 South Grand Avenue, Suite 4600
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

MATTHEW S. KAHN, SBN 261679
 MKahn@gibsondunn.com
LAUREN D. DANSEY, SBN 311886
 LDansey@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel.: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiff Deon Jones

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEON JONES, an individual,<br><br>             Plaintiff,<br><br>   v.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, in his official capacity as Chief of the Los Angeles Police Department, LOS ANGELES POLICE DEPARTMENT, a municipal entity, DOE 1, and DOES 2-10 inclusive,<br><br>             Defendants. | CASE NO.  2:20-cv-11147<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Deon Jones by and through his counsel files this Complaint against Defendants, the City of Los Angeles, the Los Angeles Police Department ("**LAPD**"), and the Chief of the Los Angeles Police Department, Michel Moore, for violating Mr. Jones's rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution and Article I, Sections Two, Three, and Seven of the California Constitution.

## INTRODUCTION

1.     For the past 75 years, the struggle for civil rights and racial justice in this country has been fueled by peaceful protest.  All too often, however, that peaceful protest has been met with virulent opposition and sometimes brute force, including acts of violence at the hands of the police.  We recall the horrific scenes from the 1960s of peaceful protesters demanding racial justice being met with unthinkable police brutality: police dogs, hoses, whips, billy clubs, tear gas, and other so-called "crowd control" tactics that were deployed to suppress the voices of peaceful civilians at some of the most seminal civil rights demonstrations in history, including on that now infamous bridge in Selma, Alabama.  Today, we see similarly inspiring and heart-wrenching scenes unfolding in cities across America as people have taken to the streets to protest the murders of George Floyd, Breonna Taylor, Tamir Rice, and other Black Americans, and to demand an end to racism in this country.

2.     Tragically, we have also witnessed today's protesters like Plaintiff Deon Jones met with the same police brutality we saw in the 1960s, this time with a more modern and potentially more dangerous weapon—the "rubber bullet."  It was this precise weapon that was fired at Mr. Jones during a protest on May 30, 2020, nearly blinding him and leaving him unable to rejoin the protests and lend his voice to a cause that has always been and continues to be deeply important to Mr. Jones.

Gibson, Dunn &
Crutcher LLP

2



*Selma, Alabama (May 1965)[1]*



*Los Angeles, California (May 2020)[2]*

3.      Mr. Jones is a 29-year-old Black man who lives and works in Los Angeles, California.  He is a performance artist, entrepreneur, and Truman Scholar who has devoted his life and energy to elevating Black voices to the forefront of the American consciousness.  This is intensely personal work for Mr. Jones—as a young Black man growing up in Mississippi, he confronted racism daily.  Among many other indignities and confrontations, every year, Mr. Jones witnessed the Ku Klux Klan host a march down the highway that backed up into his grandmother's house.  Since his youth, Mr. Jones has actively participated in local and national politics to fight the kinds of hateful and oppressive messages the KKK spewed at its rallies.

4.      Mr. Jones has been inspired in his life by many great civil rights leaders, including most notably the late Congressman John Lewis, whom he had the honor of knowing, personally, since he was 16 years old.  Mr. Jones learned many lessons from their times together, including that ordinary people can muster up the courage to stand up, speak up, speak out, and do something when they see injustice, no matter the cost.

---

[1]  Katie Nodjimbadem, <u>The Long, Painful History of Police Brutality in the U.S.</u>, Smithsonian Magazine (July 27, 2017), https://www.smithsonianmag.com/smithsonian-institution/long-painful-history-police-brutality-in-the-us-180964098/.

[2]  Josh Cain, <u>Outside Group Will Review Violent LAPD Tactics Used in Recent Protests</u>, L.A. Daily News (July 31, 2020, 12:48 PM), https://www.dailynews.com/2020/07/30/outside-group-will-review-violent-lapd-tactics-used-in-recent-protesters/.

Gibson, Dunn & Crutcher LLP

It was Congressman Lewis's voice among others that rang in Mr. Jones's head in the days following George Floyd's killing, when Mr. Jones decided to participate in the racial justice protests that were flooding the streets of Los Angeles and this country.

5.      On May 30, 2020, Mr. Jones spent the day at a peaceful protest in Los Angeles, California—lending his voice to the voices of thousands advocating for racial justice.  Mr. Jones was at all times unarmed and peaceful as he marched with friends in a peaceful demonstration in West Hollywood.  They cheered, held up signs, and listened to speeches advocating for racial equality.  But as Mr. Jones attempted to leave the protest, amidst rising tensions in the crowd, an LAPD officer in riot gear just a few feet away from him aimed and fired a rubber bullet at Mr. Jones from close range, striking Mr. Jones in the face, just below his right eye.  As he fell to the ground, bleeding from his face, the skin peeling away from his cheek bone, and his head ringing, Mr. Jones cried out:  "Why did they do this to me?"

6.      Mr. Jones suffered a fracture and lacerations to his face in addition to other injuries requiring immediate medical attention.  Mr. Jones's ophthalmologist later told him that if the rubber bullet had hit him just millimeters from where he was struck, Mr. Jones could have been blinded or killed.

7.      The LAPD's frequent oppression and mistreatment of peaceful demonstrators at these protests has been well-documented.  Videos show LAPD officers attacking and threatening protesters, tasing incapacitated protesters, and otherwise inflicting harm on protesters seeking only to exercise their First Amendment rights to advance the cause of racial justice.

8.      Among its many aggressive tactics, the LAPD has repeatedly and indiscriminately shot Kinetic Impact Projectiles ("**KIPs**")—commonly called "rubber bullets," "foamed tipped projectiles," or "less lethal" projectiles (hereinafter, "**Rubber Bullets**")—at large groups of protesters without regard for where they were being

aimed.[3]  These violent assaults by the LAPD on crowds of peacefully assembled people have suppressed demonstrators and their messages.

9.     Rubber Bullets deployed by the LAPD cause far more serious harm than their name suggests.  In fact, the moniker "less lethal" weapon is dangerously misleading.  Rubber Bullets cause scores of serious injuries and deaths every year.  In a study analyzing the morbidity and mortality associated with Rubber Bullets from January 1, 1990, to June 1, 2017, researchers found 71% of people struck by KIPs suffered severe injuries, 15.5% of individuals were permanently disabled, and 3% died from their injuries.[4]  49% of all deaths and 82.6% of all permanent disabilities observed in the study were due to Rubber Bullet strikes to the head.[5]  Accordingly, while these weapons may be "less lethal" than traditional ammunition, Rubber Bullets are far from harmless and are capable of causing severe permanent injury and death.

10.    The LAPD's attack on Mr. Jones on May 30, 2020, was plainly unconstitutional under both the U.S. and California Constitutions, and Mr. Jones has suffered grievous harm as a result.  Mr. Jones therefore brings this action to recover for his injuries.  But Mr. Jones also seeks prospective relief to ensure that he and his fellow protesters will be able to exercise their constitutional right to engage in peaceful protest without fearing for their health or safety.

---

[3]  James Queally, Kevin Rector, & Richard Winton, Troubling video capture L.A. police violence, aggression amid demonstrations, L.A. Times (June 4, 2020), https://www.latimes.com/california/story/2020-06-04/videos-capture-police-violence-aggression-amid-l-a-protests.

[4]  Rohini J Haar, Vincent Iacopino, Nikhil Ranadive, Madhavi Dandu, & Sheri D Weiser, Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review, BMJ Open (2017), https://bmjopen.bmj.com/content/bmjopen/7/12/e018154.full.pdf

[5]  Id.

Gibson, Dunn & Crutcher LLP

 

*Mr. Jones after being struck by a Rubber Bullet*

11.    It is time for the LAPD to stop deploying Rubber Bullets to suppress peaceful protests.  The right to protest peacefully, to march, and to petition the government for a redress of grievances is fundamental and cannot be "controlled" or suppressed through arbitrary and unconscionable violence.

12.    This country was born in protest, and the Founders that created our nation inscribed the right to protest into the very first amendment of the Bill of Rights.  As the United States Supreme Court has acknowledged, "'speech to protest racial discrimination is essential political speech lying at the core of the First Amendment.'" *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 915 (1982) (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979)).  Unless this Court acts now, the LAPD's unconstitutional use of Rubber Bullets to attack, control, and suppress peaceful protest will continue just like the attacks on civil rights demonstrators a generation ago.  This cycle of violence must be stopped, peaceful protests must be

Gibson, Dunn &
Crutcher LLP

6

permitted to continue unabated, and the LAPD must be held to account for its persistent and egregious assaults on protesters lawfully exercising their constitutional rights.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over Mr. Jones's claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to issue declaratory and/or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

14.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and the events giving rise to the claims herein occurred in the Central District of California.

## PARTIES

15.    Plaintiff Deon Jones is a 29-year-old Black man who lives and works in Los Angeles, California.  He is a performance artist, entrepreneur, and Truman Scholar who has devoted his life and energy to elevating Black voices to the forefront of the American consciousness.  This is intensely personal work for Mr. Jones—as a young Black man growing up in Mississippi, he confronted racism daily.  Among many other indignities and confrontations, every year, Mr. Jones witnessed the Ku Klux Klan host a march down the highway that backed up into his grandmother's house.  Since his youth, Mr. Jones has actively participated in local and national politics to fight the kinds of hateful and oppressive messages the KKK spewed at its rallies.  Mr. Jones worked in then-Vice President Joe Biden's public engagement office, was the national spokesperson for Campaign for Justice, served on the board of Colin Powell's America's Promise Alliance, was named a Harry S. Truman Scholar, and was elected to the Advisory Neighborhood Commission (becoming Washington D.C.'s youngest elected official at the time)—all while in college.  Mr. Jones's commitment to public service did not end at graduation.  He became a Truman-Albright Fellow and worked at Be The Change, an organization focusing on promoting participation in post-graduate service

organizations, such as Teach For America.  Mr. Jones also served as the special assistant to the United States Deputy Secretary of Defense for Military Community and Family Policy Col. Robert L. Gordon III, before becoming part of the team comprised of Obama Administration officials that started a non-profit called Opportunity@Work, tasked with operationalizing President Obama's TechHire Initiative, which works to help individuals who often lack college degrees gain the necessary skills to qualify for technical jobs.

16.    Today, Mr. Jones lives and works in Los Angeles as an artist and creative consultant, where—among other endeavors—he has worked with renowned conceptual artist Glenn Kaino on numerous creative projects, including with OWN: The Oprah Winfrey Network on its digital media presence; with actor and activist Jesse Williams on digital projects focusing on Black language and telling the stories of Black people; and with Olympic Gold Medalist Tommie Smith, made famous by his Black Power salute on the podium at the 1968 Olympic Games, to create art that encourages conversations about social justice.  Following Mr. Floyd's killing, Mr. Jones decided to participate in the racial justice protests to further his mission of bringing unheard Black voices to the center of American discourse.

17.    Defendant LAPD is a local government entity and an agency of Defendant the City of Los Angeles.  The City of Los Angeles is liable for the actions of the LAPD.

18.    Defendant City of Los Angeles is a municipal corporation duly organized and existing under the Constitution and laws of the State of California.  The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which give rise to Mr. Jones's civil rights claims.

19.    Defendant LAPD Chief Michel Moore is, and was at all times relevant to this action, the chief policymaker for the LAPD.  He is sued in both his individual and official capacities.

20.    Defendant Doe 1 is an agent, servant, and employee of Defendants the City of Los Angeles and/or the LAPD.  Doe 1 is the LAPD officer that fired the Rubber Bullet

at Mr. Jones, striking him in the face and causing Mr. Jones's injuries. Mr. Jones is ignorant of the true name and capacity of Defendant sued herein as Doe 1, and therefore sues Defendant Doe 1 by such fictitious name.

21. Defendants Does 2 through 10 are agents, servants, and employees of Defendants the City of Los Angeles and/or the LAPD. Mr. Jones is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. Mr. Jones will amend this Complaint to allege their true names and capacities when those identities are ascertained. The individual Doe Defendants are sued in both their individual and official capacities. At all relevant times, Does 1 through 10, in addition to the named Defendants, were and are responsible for the damages and injuries alleged in this Complaint. And at all relevant times, Does 1 through 10 were the agents, servants, and employees of the City of Los Angeles and the LAPD, and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer.

## FACTUAL ALLEGATIONS

## I. George Floyd's Murder at the Hands of the Police Sets Off Protests in Los Angeles and Around the World

22. On May 25, 2020, George Floyd, an unarmed Black man, was killed by a Minneapolis police officer who kneeled on Mr. Floyd's neck for eight minutes and 46 seconds, ignoring his repeated pleas and draining the life from his body. The video of Mr. Floyd's killing sparked outrage, heartbreak, and a wave of protests in the United States and abroad that continues today.

23. Mr. Floyd's death followed on the heels of several other recent racially charged killings of Black Americans by law enforcement and vigilantes, including the fatal shootings of Ahmaud Arbery, who was shot while jogging, and Breonna Taylor, who was shot by plainclothes officers executing a "no-knock" search warrant in Ms. Taylor's home. The deaths of Mr. Floyd, Mr. Arbery, and Ms. Taylor are not isolated

incidents.  In recent years, Trayvon Martin, Eric Garner, Michael Brown, Sandra Bland, Tamir Rice, Philando Castile, Botham Jean, and countless other Black Americans have suffered similar tragic and senseless deaths, each sparking protests and demonstrations in their own right.

24.    Following Mr. Floyd's murder, large protests broke out in communities across the country, including here in Los Angeles.  Like many Americans, and particularly as a Black man, Mr. Jones was deeply saddened and distressed by Mr. Floyd's murder.  In the days that followed, drawing on his background in politics and social justice, Mr. Jones organized and attended a number of protests in downtown Los Angeles, where demonstrations have been held continuously since.  Together, Mr. Jones and others lent their voices to an enduring movement that started at the Founding of our nation demanding—at long last—racial justice in America.

**A.    Los Angeles Protesters Are Met with Police Violence on Memorial Day Weekend**

25.    On Friday, May 29, 2020, Mr. Jones organized a protest in downtown Los Angeles.  At around 5:00 p.m., several hundred individuals set off from City Hall with signs.  Throughout the course of the march, which lasted several hours, the group was blockaded and diverted by LAPD officers in full riot gear.  The police also employed a strategy called "kettling"—an aggressive crowd control tactic that corrals and traps groups of people by surrounding them with officers and preventing the group from moving.

26.    Later that evening, Mr. Jones and his fellow protesters, including his friend Niara Hill, were kettled by LAPD officers.  After several hours of being trapped in by the police, a lone, non-violent, and apparently unarmed protester approached a line of LAPD officers and attempted to speak with them.  In response, and without provocation or warning, an LAPD officer shot him at close range with a Rubber Bullet.

27.    The shot caused instant and widespread chaos throughout the crowd. Protesters ran in every direction.  LAPD officers sprayed more Rubber Bullets into the

crowd, and the protesters attempted to flee for their safety.  Rubber Bullets struck two of Mr. Jones's friends, including Ms. Hill, who was also trampled by protesters fleeing the LAPD's violent attack.

**B.      The Next Day Mr. Jones Is Shot in the Face with a Rubber Bullet**

28.      Concerned for his safety but determined to make his voice heard, Mr. Jones returned to protest the following day.  On Saturday, May 30, 2020, Black Lives Matter Los Angeles organized a protest in Pan Pacific Park, located in the West Hollywood neighborhood of Los Angeles.  The scene that day was joyful: the crowd was enjoying speeches and chanting, grandparents were playing with their grandchildren, and music played in the background.  *See* **Exhibit A**.  Mr. Jones and Ms. Hill arrived around 2:00 p.m., shortly before the speeches in the park came to a close.  Mr. Jones believed that the family-centric atmosphere meant a lower risk of police violence than the night before.  He would soon be proven wrong.

29.      Mr. Jones marched with the thousands of protesters down Beverly Boulevard to Fairfax Avenue, until the march reached Fairfax Avenue and 3rd Street.  There, the protest gathered for its conclusion and final speeches.  Following the conclusion of the Black Lives Matter Los Angeles programming, Mr. Jones marched with the protesters down Fairfax Boulevard, toward Beverly Hills, where they were met with a line of LAPD officers outfitted in full riot gear.  Mr. Jones and Ms. Hill had agreed to stay off of the front lines after their violent experience with the police the night before, so they, along with other protesters, moved toward an adjacent parking lot in front of a Trader Joe's to get away from the LAPD officers and start making their way home.

30.      The police began forming a line to hold the protesters in the parking lot, most of whom, like Mr. Jones, were simply trying to leave the protest.  LAPD officers were delivering confusing orders by directing the protesters to disperse, but giving the crowd no avenue to do so because, as they had the night before, the officers were employing the "kettling" tactic.  At one point, Mr. Jones felt a LAPD officer's club strike him across the back as he tried to leave while filming the scene with his phone.  He saw

LAPD officers striking protesters with batons as the officers continued to kettle the protesters.

31.     As Mr. Jones tried to exit the parking lot, Defendant Doe 1, an officer, turned, aimed, and fired a Rubber Bullet at Mr. Jones from pointblank range, striking him in the right side of his face.  Mr. Jones described the moment of impact as akin to "having [his] face blown off."  His face searing with pain, Mr. Jones attempted to run but soon collapsed.

32.     Ms. Hill found Mr. Jones lying on the ground, bleeding profusely and with skin hanging off of his extremely swollen face.  Mr. Jones was in a daze and repeatedly asked Ms. Hill:  "Why did they shoot me?"  The impact produced an intense ringing in his head that would recur throughout his long recovery process.

## II.     Mr. Jones's Trauma and Lasting Injuries

33.     Mr. Jones was transported to the hospital by two strangers, medical students, who stopped to help clean and dress his wounds while he was lying on the ground bleeding from his face.  Upon arriving at the hospital, Mr. Jones learned that he had suffered a laceration to his face that required ten stitches, a closed fracture of his zygomatic arch and maxilla bone,[6] and a head injury.  Mr. Jones spent over eight hours in the hospital and ultimately incurred over $12,000 in medical bills.

34.     The day after Mr. Jones was struck, he began to experience dizziness.  He would sporadically hear ringing in his head like the sound he heard when he was initially hit.  He also coughed up blood in the days immediately following the shooting.  For weeks Mr. Jones suffered nightmares about his assault and would wake up with the same ringing sensation in his head.

35.     Mr. Jones's ophthalmologist removed his stitches a couple of weeks after the incident.  He advised Mr. Jones that if the projectile had struck him just millimeters to the right, Mr. Jones likely would have been blinded, and if the projectile had struck

---

[6]  The zygomatic arch and maxilla bone are bones in the face, located under the cheek and around the eye.

Gibson, Dunn & Crutcher LLP

him just millimeters to the left, the projectile would have hit his temple and Mr. Jones very easily could have been killed.

36.     As of today, nearly seven months since the assault, Mr. Jones's face remains in a fragile condition, and he still has not fully recovered.  As a result, he has not been able to engage in many physical activities for fear of reinjury.

37.     Mr. Jones has begun to see a therapist as a result of the traumatic events that he has experienced.  While his symptoms come and go, the video of Jacob Blake, an unarmed Black man shot by police in Kenosha, Wisconsin on August 23, 2020, brought back the ringing, nightmares, and trauma for Mr. Jones with renewed force, as have more recent events both in Los Angeles and around the country.

38.     There is no telling when Mr. Jones will make a full recovery.  And his doctors have made clear that if he is shot in the face again by another bullet, the resulting injury would be even more serious than his first one and would more than likely cause catastrophic damage.

### III.     Rubber Bullets Can Cause Severe Injury, Permanent Disability, and Death

39.     What happened to Mr. Jones was not an anomaly but rather a much too common consequence of the LAPD's dangerous so-called crowd-dispersal practices.  Specifically, the LAPD uses a host of weapons, like Rubber Bullets, for crowd control, that it misleadingly labels "less lethal."

40.     Rubber Bullets are 40mm Exact Impact kinetic, hard foam-tipped projectiles.  Officers fire them from the 40mm "less lethal" launcher, which is essentially a modified shotgun.  Attached hereto as **Exhibit B** is the LAPD Use of Force-Tactics Directive No. 17 regarding the 40mm Less-Lethal Launcher (the "40mm Tactics-Directive").  The 40mm Tactics-Directive states that the 40mm "less lethal" launcher weapon is to be fired at the intended target's navel area, legs, or arms, and "**shall not be used to target the head, neck, face, eyes or spine**."[7]  In practice, however, the LAPD

---

[7] Ex. B, at 1 (emphasis added).

Gibson, Dunn &
Crutcher LLP

takes no precautions with respect to where it aims these weapons, and officers fire them indiscriminately at the torsos and heads of the people of this city whenever they are gathered in large crowds, and in the case of Mr. Jones, directly at his face from a close range.[8]



*Police Routinely Clear Protesters with Rubber Bullets*

41.     Sadly, Mr. Jones's injuries are not unique.  Reports of protesters suffering fractured skulls, lost eyes, and other serious injuries from Rubber Bullets have become routine since protests began in Los Angeles this summer.[9]  For example, on June 2, 2020, Ben Montemayor, a 28-year-old filmmaker, was hit by a Rubber Bullet in Hollywood.  Mr. Montemayor was struck in the groin causing one of his testicles to swell to twice its usual size and forcing him to undergo immediate emergency surgery.[10]

---

[8]   Kevin Rector, One Man's Eye 'Exploded,' Another Lost Eight Teeth from LAPD Projectiles Fired at Lakers Revelers, L.A. Times (Oct. 15, 2020, 5:00 AM), https://www.latimes.com/california/story/2020-10-15/lapd-projectiles-gruesome-injuries-lakers-celebration.

[9]   *See, e.g.*, Knvul Sheikh & David Montgomery, Rubber Bullets and Beanbag Rounds Can Cause Devastating Injuries, N.Y. Times (June 12, 2020), https://www.nytimes.com/2020/06/12/health/protests-rubber-bullets-beanbag.html/; Liz Szabo, Jay Hancock, Kevin McCoy, Donovan Slack & Dennis Wagner, Fractured Skulls, Lost Eyes: Police Often Break Own Rules Using 'Rubber Bullets', USA Today (June 19, 2020), https://khn.org/news/rubber-bullets-protesters-police-often-violate-own-policies-crowd-control-less-lethal-weapons/.

[10]   Kevin Rector, Video Shows LAPD Officer Shooting Protester in Groin at Close Range, L.A. Times (Sept. 19, 2020), https://www.latimes.com/california/story/2020-09-19/video-shows-lapd-officers-protesters-shoot-him-in-groin.

42.   The LAPD has a long history of using Rubber Bullets.[11]   It deployed Rubber Bullets as early as 1992 in response to protests sparked by the brutal beating of Rodney King by LAPD officers.[12]   The LAPD used Rubber Bullets again in August 2000 to forcibly break up protests outside the Democratic convention, blinding at least one woman.[13]   Then, in May 2007, the LAPD deployed Rubber Bullets against crowds at the MacArthur Park Protests calling for amnesty for undocumented immigrants.   The LAPD used Rubber Bullets again in October 2011 during the Occupy protests.[14]   More recently, on October 11, 2020, 22-year-old William Gonzalez was hit in the eye with a Rubber Bullet shattering his eye socket, ripping apart his tear duct, and exploding his eyeball when he was out celebrating the L.A. Lakers' NBA title win outside the Staples Center.[15]   He is now permanently blind in his right eye.   During that same incident, 25-year-old Manny Barrientos lost eight teeth and suffered severe injury to his lip when one of the LAPD's Rubber Bullets struck his mouth.[16]

---

[11]   Joel Rubin, LAPD Violence Against George Floyd Protests Erodes a Decade of Reforms, L.A. Times (June 14, 2020, 5:00 AM), https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics.

[12]   Dean E. Murphy, Rubber Bullets Pass LAPD Test: Police Officers Used New 'Knee Knockers' to Disperse Crowd.  Officials Say the Non-lethal Munitions Appear to be Working Well, L.A. Times (Dec. 17, 1992, 12:00 AM), https://www.latimes.com/archives/la-xpm-1992-12-17-me-2994-story.html.

[13]   Rubin, supra, note 11.

[14]   Id.

[15]   Rector, supra, note 8 ("He will never see out of his right eye and will probably need to have it removed to avoid the threat of losing vision in his good eye through a phenomenon known as sympathetic ophthalmia—a process by which the immune system begins to attack both eyes if one is traumatized beyond repair and remains in the body.").

[16]   Sareen Habeshian & Chris Wolfe, Man Says He Lost 8 Teeth, Chunk of Lower Lip When LAPD Rubber Bullet Hit Him Amid Lakers Championship Celebration, CBS42 (Oct. 14, 2020, 1:11 PM), https://www.cbs42.com/news/u-s-world/man-says-he-lost-8-teeth-chunk-of-lower-lip-when-lapd-rubber-bullet-hit-him-amid-lakers-championship-celebration/.

**IV.**   **The LAPD's Unlawful Practices and Policies and the Lack of Training Allow the LAPD to Use Violent Force Indiscriminately as a Crowd-Dispersal Tactic**

**A.**   **Policies and Practices of the LAPD**

43.     The LAPD purports to follow written policies when using force, but their practices and customs diverge significantly from those policies.  The LAPD ostensibly operates under the Policy on the Use of Force (the "**Policy**"), which is an official policy approved by the Board of Police Commissioners providing rules regarding the LAPD's use of force.  The Policy is supplemented by "**Tactics-Directives,**" which contain detail on specific aspects of the Policy and are incorporated into the Policy.  Pursuant to the 40mm Tactics-Directive, officers are allowed to use "less lethal" weapons against a crowd, but ***only*** when an officer determines that an individual suspect is actively resisting arrest or attempting to evade arrest.  Moreover, the Policy acknowledges that "less lethal" uses of force are capable of inflicting serious injury, and therefore reiterates that the use of "less lethal" weapons are permissible ***only*** when an officer reasonably believes that a suspect is violently resisting arrest or poses an immediate threat of violence or physical harm.  According to the Policy, "less lethal" force options ***shall not be used*** against a suspect who is passively resisting or failing to comply with commands.  Further, "less lethal" force may only be used in crowd control situations against a single subject in an individualized, target-specific fashion.[17]

44.     The LAPD, however, has developed a practice and custom of using "less lethal" weapons against a subject who is ***not*** subject to arrest, ***not*** violently resisting arrest, and is ***not*** posing an immediate threat of violence or physical harm to officers, themselves, or other individuals.  Instead, as accounts from the George Floyd protests in Los Angeles reveal, LAPD officers spray Rubber Bullets indiscriminately into crowds of protesters, seemingly with no specific target in mind.  The LAPD's indiscriminate use

_____

[17]  Ex. B, at 1.

of "less lethal" weapons against protesters is a routine practice.  At the Democratic National Convention in Los Angeles in 2000, the MacArthur Park May Day protests in 2007, the Occupy Los Angeles protests in 2011, and the George Floyd protests in May and June of 2020, as explained above, the LAPD has used this tactic time and again against peaceful protesters, like Mr. Jones, who were exercising their constitutional rights.[18]  The LAPD were not employing Rubber Bullets to incapacitate any one individual resisting arrest or for any lawful purpose.  Rather, the LAPD sprayed Rubber Bullets into a crowd to punish protesters for their political speech and to deter similar expressions of constitutionally protected speech.

45.    Defendants therefore have a custom of authorizing excessive force by the LAPD against peaceful protesters engaged in constitutionally protected conduct. Indeed, the LAPD has acknowledged that its officers consistently and historically commit unlawful and violent acts against peaceful protesters and that LAPD line and command staff do not receive adequate training on proper law enforcement conduct and procedures at public demonstrations.  For example, the Settlement Agreement arising from *Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D. Cal. 2007)—a case brought to challenge police brutality by the LAPD at the May Day protests in MacArthur Park in 2007—included a $12,850,000 payment to individuals and a Structural Relief Order establishing guidelines for LAPD officers' conduct toward protesters to preserve protesters' First Amendment rights.[19]   This

---

[18] Donovan Slack, Dennis Wagner, Kevin McCoy & Jay Hancock, <u>Police Use of Rubber Bullets, Bean Bag Rounds has Left a Bloody Trail for Decades</u>, USA Today (July 24, 2020, 6:36 AM), https://www.usatoday.com/in-depth/news/nation/2020/07/24/rubber-bullets-less-lethal-weapons-victims-police-protesters-decades/5410519002/; Maeve Reston & Joel Rubin, <u>L.A. to Pay $13 Million to Settle May Day Melee Suits</u>, L.A. Times (Feb. 5, 2009, 12:00 AM), https://www.latimes.com/archives/la-xpm-2009-feb-05-me-lapd-settlement5-story.html; Associated Press, <u>LAPD Video Shows Protester With Hands Up Shot in Head by Rubber Bullet</u>, NBC L.A. (Aug. 2, 2020, 1:57 PM), https://www.nbclosangeles.com/news/local/lapd-video-protester-hands-up-shot-in-head-by-rubber-bullet/2406184/.

[19] Settlement Agreement, *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, No. CV 07-3072 AHM, 2009 WL 9112416 (C.D. Cal. June 24, 2009).

directive was only necessary because the LAPD could not, or would not, train its own officers to perform their duties in a constitutional manner. The recurrence of the same constitutional violations over a decade later reveals the LAPD's intentional and institutional refusal to preserve the constitutional rights of protesters.

46.    Since the Settlement Agreement in *Multi-Ethnic Immigrant Workers Organizing Network*, the LAPD has continued to fail to adequately train its officers and command staff in, among other things, the rights of demonstrators, lawful crowd control, dispersal orders, separating those engaged in unlawful conduct from those engaged in lawful conduct, the permissible use of "less lethal" weapons in crowd-control situations, and the permissible use of force and circumstances justifying the use of force in crowd-control situations.[20]    This failure amounts to deliberate indifference by the LAPD to the rights of persons its officers are sworn to serve and protect, and demonstrates the LAPD's intention ***not*** to properly train its law enforcement personnel.

47.    The LAPD's violent attacks on peaceful protesters have only gotten worse. Specifically, on May 28, 29, and 30 (and beyond) in this year, the LAPD has deployed "less lethal" weapons on protesters, and has continued to deploy "less lethal" weapons against peaceful demonstrators and crowds.   Disturbing videos documenting the indiscriminate nature of the LAPD's use of Rubber Bullets are readily available online. *See* **Exhibits C**, **D**.   These videos reveal that the LAPD has tacitly and explicitly authorized the indiscriminate use of "less lethal" weapons on crowds of protesters at demonstrations on these dates, protesters like Mr. Jones.  The LAPD, acting pursuant to its plainly unconstitutional policy, custom, and practice, unlawfully used "less lethal" weapons against Mr. Jones as alleged above.

---

[20]  Indeed, instead of investing in training to protect the lives of Angelenos, in 2015 the LAPD invited Dave Grossman, a retired Army Ranger, to conduct a training for over six hundred officers on what he calls "killology": a concept designed to aid police officers to kill in the line of duty with less hesitation and teaches that "killing is just not that big of a deal" in the line of duty.  Kelly McLaughlin, <u>One of America's Most Popular Police Trainers is Teaching Officers How to Kill</u>, Insider (June 2, 2020, 2:53 PM), https://www.insider.com/bulletproof-dave-grossman-police-trainer-teaching-officers-how-to-kill-2020-6.

Gibson, Dunn & Crutcher LLP

48.     Despite the widely reported and well-documented accounts that police officers routinely engaged in this unlawful practice, Defendants have not revised the policy and remain deliberately indifferent to this unlawful custom and practice.  The supervisory Defendants who have been unable or unwilling to prevent LAPD officers' improper use of "less lethal" weapons thus have in effect authorized, made, and ratified the decision to attack peaceful protesters, including Mr. Jones.

### B.     Action of Policymaking Officials

49.     Chief Moore and officials of the City of Los Angeles have a sufficiently senior role such that their decisions may fairly be said to represent official policy of the City of Los Angeles and the LAPD.  Chief Moore and those same officials of the City of Los Angeles chose to condone the use "less lethal" weapons against protesters, including Mr. Jones.  Chief Moore is the highest authority within the LAPD, and has knowledge of both the continuous and indiscriminate use of "less lethal" weapons against protesters and the failure to effectively train officers as alleged above.  Therefore, the decision to use "less lethal" weapons was effectively made by official policy makers and Chief Moore.

### C.     Ratification

50.     The decision to use "less lethal" weapons against the crowds, of which Mr. Jones was a part, on May 30, 2020 was ratified by Chief Moore.

51.     In an effort to justify, defend, and condone the violent LAPD response to protesters, Chief Moore blamed the crowd, stating in a news conference on Monday, June 1, 2020:  "We didn't have protests last night.  We had criminal acts.  We didn't have people mourning the death of this man, George Floyd, we had people capitalizing. His death is on their hands, as much as it is those officers."[21]

---

[21] Richard Winton, Cindy Chang & Benjamin Oreskes, <u>LAPD Chief Michel Moore's Comments on Looters Create Political Firestorm</u>, L.A. Times (June 3, 2020, 10:42 AM), https://www.latimes.com/california/story/2020-06-03/lapd-chief-moores-comments-on-looters-create-political-firestorm-even-after-he-apologized.

Gibson, Dunn & Crutcher LLP

**V.     Apprehensive Protesters Continue to Engage in Peaceful Protests Despite the High Likelihood that the LAPD Will Use Rubber Bullets Indiscriminately as a Crowd Dispersal Tactic**

    **A.     Aggressive "Crowd Control" Tactics Against Racial Justice Protests Have An Infamous History And Continue To Recur**

52.     A protest sign from the 1963 March on Washington hangs in the Smithsonian's National Museum of African American History and Culture.  It reads "We Demand an End to Police Brutality Now!"[22]  Tragically, that sign—and its passionate plea for justice—is needed not only in the museum to educate about the past, but also on the streets of cities throughout America, including right here in Los Angeles.

53.     As Americans find themselves amidst a long overdue rebirth of the movement for racial justice and equality in America, those brave enough to join the fight have once again found themselves targeted with extreme violence by law enforcement. Peaceful protesters in the 1960s were regularly subjected to violence at the hands of police.  Americans are or should be familiar with the horrific scenes of peaceful protesters met with unthinkable police brutality:  police dogs, hoses, whips, billy clubs, tear gas, and other so-called "crowd-control" tactics that were deployed to suppress the voices of peaceful civilians at some of the most seminal civil rights demonstrations in history, including on March 7, 1965, in Selma, Alabama on the now-infamous Bloody Sunday.

54.     Today, similar scenes are unfolding in cities across America as people have taken to the streets to protest the murders of George Floyd, Breonna Taylor, Tamir Rice, and other Black Americans, and to demand an end to racism in this country.  These protesters are being met by twenty-first century versions of this same police violence.

---

[22]  Katie Nodjimbadem, The Long, Painful History of Police Brutality in the U.S., Smithsonian Mag. (May 29, 2020), https://www.smithsonianmag.com/smithsonian-institution/long-painful-history-police-brutality-in-the-us-180964098/.

Gibson, Dunn & Crutcher LLP

55.    Those protests have continued unabated in the wake of the George Floyd protests.  Black Lives Matter LA, for instance, had been holding events to protest police brutality and advocate for racial justice, such as the weekly #JackieLaceyMustGo Neighborhood Walks, where members of the community joined members of Black Lives Matter LA in canvassing neighborhoods in an effort to vote Los Angeles District Attorney Jackie Lacey out of office due to her reluctance to file charges against police officers who have unjustly killed or injured Black people.  Black Lives Matter LA is continuously planning other activism efforts at its weekly meetings.  They fully expect that the police will continue to employ dangerous crowd-control methods, including Rubber Bullets, at anticipated protests and demonstrations, as the LAPD has yet to show the citizens of the City of Los Angeles that they are capable of doing otherwise.[23]

56.    Mr. Jones wanted to return to the protests in June but decided not to because he was afraid of being injured again by the LAPD.  In fact, his doctors have told him that if the LAPD shoots him again with rubber bullets, the resulting damage could be even more serious than his first wound, as the initial damage has rendered him more vulnerable to suffering catastrophic harm from projectiles or other blunt-force trauma to his face.  Looking ahead, Mr. Jones wishes to be free to exercise his constitutional rights of freedom of speech and association by engaging in upcoming demonstrations and expressive activities, however they may arise, in the City of Los Angeles.  However, Defendants' conduct has made Mr. Jones fear for his safety and caused him concern about the exercise of his constitutional rights.  To be clear:  Mr. Jones is afraid to protest due to the risk that the LAPD may once more inflict unwarranted violence against him and other protesters.[24]  Mr. Jones is also afraid that he may again be injured by a Rubber

---

[23] Organize, Black Lives Matter L.A., https://www.blmla.org/organize/ (last visited Nov. 17, 2020).

[24] Ronald Brownstein, Democrats Won't Cede the Streets This Time, Atlantic (Sept. 10, 2020), https://www.theatlantic.com/politics/archive/2020/09/how-democrats-are-preparing-post-election-chaos/616255/.

Gibson, Dunn &
Crutcher LLP

Bullet from the LAPD if he chooses to exercise his constitutional rights of freedom of speech and association by engaging in demonstrations.

## COUNT I

### Violation Of First Amendment To The United States Constitution
### (42 U.S.C. § 1983)

57.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

58.     Defendants' decision to shoot Mr. Jones with a Rubber Bullet violates the First Amendment in at least five ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of the right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; (iv) as unconstitutional content- and viewpoint-based discrimination; and (v) as a violation of Mr. Jones's right to record matters of public interest.

59.     Defendants have adopted municipal policies, practices, and customs that have caused the violations complained of herein; and, in the alternative, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

60.     Chief Moore and officials of the City of Los Angeles elected to use "less lethal" weapons against protesters and Mr. Jones, have knowledge of the indiscriminate use of "less lethal" weapons against protesters, and have nonetheless failed to effectively train officers as alleged above.

61.     Mr. Jones's rights to assemble, protest, and demonstrate peaceably are all protected activities under the First Amendment of the United States Constitution.  As the U.S. Department of Justice stated recently, "First Amendment protection is at its apex when citizens seek to engage in core political speech in a traditional public forum." Brief for the United States as *Amicus Curiae* Supporting Appellants and Urging Vacatur, *Givens v. Newsom*, No. 20-15949, 2020 WL 3393978 at *13 (9th Cir. June 10, 2020).

62.     Defendants acted under color of State law when they deprived Mr. Jones of his rights to assemble, protest, and demonstrate peaceably by shooting him in the face with a Rubber Bullet.

63.     Defendants' use of force against Mr. Jones and other similarly situated protesters was substantially motivated by the protesters' and Mr. Jones's engagement in First Amendment protected activity, constituted an effort to deter future similar activity, and evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

64.     The above-described conduct was, and continues to be, a proximate cause of Mr. Jones's enduring pain and suffering and has chilled his desire to participate in future protests. These violations of the First Amendment are also continuing and causing irreparable harm.

## COUNT II

### Violation Of Fourth Amendment To United States Constitution

### (42 U.S.C. § 1983)

65.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

66.     Mr. Jones was seized by Defendants when Defendants' officers intentionally, by kettling and through the use of force and Rubber Bullets, terminated his freedom of movement.

67.     Defendants acted under color of State law when Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

68.     Mr. Jones did not commit a crime.

69.     Mr. Jones did not pose a threat to Defendants or any of their officers or agents or any other person.

Gibson, Dunn &
Crutcher LLP

70.     Mr. Jones's Fourth Amendment rights were violated when he was deliberately targeted and shot with Rubber Bullets during the course of his lawful protest.

71.     Mr. Jones fears further retaliation in the future in violation of the Fourth Amendment if he continues to observe, record, or participate in constitutionally protected activity.

72.     As a direct and proximate result of Defendants' unlawful actions, Mr. Jones endured pain and suffering.   These violations of the Fourth Amendment are also continuing and causing irreparable harm.

## COUNT III

### Violation Of Fourteenth Amendment To United States Constitution
### (42 U.S.C. § 1983)

73.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

74.     Defendants acted under color of State law when they decided to forcibly disperse Mr. Jones by using Rubber Bullets, thereby violating Mr. Jones's Fourteenth Amendment right to due process.

75.     Mr. Jones has protected First Amendment liberty interests in the right to assemble, protest, and demonstrate peaceably.

76.     Mr. Jones has a right to not be subject to excessive force in the context of engaging in this expressive First Amendment activity.

77.     By violently attacking unarmed protesters engaged in expressive conduct, Defendants have engaged in conduct that was "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and therefore that conduct constitutes excessive force in violation of the Due Process Clause of the Fourteenth Amendment.

78.     As a direct and proximate result of Defendants' unlawful actions, Mr. Jones endured pain and suffering.  These violations of the Fourteenth Amendment are also continuing and causing irreparable harm.

## COUNT IV

### Freedom of Speech Under the California Constitution
### (Article I, Section 2 of California Constitution)

79.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

80.     Defendants' decision to forcibly disperse Mr. Jones by using Rubber Bullets violates Mr. Jones's rights under Article I, Section 2 of the California Constitution.

81.     In California "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."  Cal. Const. art. 1, § 2.

82.     "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution."  *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1167 (9th Cir. 2007).

83.     Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

84.     The above-described conduct was a proximate cause of harm to Mr. Jones.

85.     Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 2 of the California Constitution.

## COUNT V

### Freedom of Assembly Under the California Constitution
### (Article I, Section 3 of California Constitution)

Gibson, Dunn & Crutcher LLP

86.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

87.     In California "[t]he people have the right to . . . assemble freely to consult for the common good."  Cal. Const. art. 1, § 3.

88.     Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

89.     The above-described conduct was a proximate cause of harm to Mr. Jones.

90.     Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 3 of the California Constitution.

## COUNT VI

### Due Process Under the California Constitution

### (Article I, Section 7 of California Constitution)

91.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

92.     In California, "[a] person may not be deprived of life, liberty, or property without due process of law."  Cal. Const. art. 1, § 7.

93.     Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

94.     The above-described conduct was a proximate cause of harm to Mr. Jones.

95.     Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 7 of the California Constitution.

## COUNT VII

### Search and Seizure Under the California Constitution

### (Article I, Section 13 of California Constitution)

96.     Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

Gibson, Dunn & Crutcher LLP

97.    In California, "[the] right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated." Cal. Const. art. 1, § 13.

98.    Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

99.    The above-described conduct was a proximate cause of harm to Mr. Jones.

100.    Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 13 of the California Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Jones respectfully requests from this Court:

(1)    A preliminary and permanent injunction barring Defendants from engaging in the unconstitutional conduct of using Rubber Bullets, and imposing appropriate remedial measures to prevent the repetition of such conduct in the future as the Court deems necessary;

(2)    A declaratory judgment that Defendants' conduct complained of herein was a violation of Mr. Jones's rights under the Constitution and Laws of the United States;

(3)    A declaratory judgment that Defendants' conduct complained of herein was a violation of Mr. Jones's rights under the California Constitution;

(4)    General, compensatory, and punitive damages for Mr. Jones for the violations of his federal constitutional and statutory rights—but not for any violation of his rights under the California Constitution—all to be determined according to proof;

(5)    An award of attorneys' fees pursuant to 42 U.S.C. § 1988;

(6)    Costs of suit;

(7)    Pre- and post-judgment interest as permitted by law; and

(8)    Such other and further relief as the Court may deem just and proper.

Gibson, Dunn &
Crutcher LLP

1  Dated:  December 9, 2020                GIBSON, DUNN & CRUTCHER LLP

2                                          By: _/s/_ Katherine Marquart

3                                               Katherine Marquart

4                                               Attorney for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated:  December 9, 2020

By: */s/ Katherine Marquart*
Katherine Marquart

Attorney for Plaintiff

# EXHIBIT A
# Video Manually Filed



# EXHIBIT B



LOS ANGELES POLICE DEPARTMENT

# USE OF FORCE-TACTICS DIRECTIVE

| Directive No. 17 | July 2018 |
|---|---|

## 40mm LESS-LETHAL LAUNCHER

### PURPOSE

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operation procedures of the 40mm Less-Lethal Launcher (40mm LLL).



### PROTOCOL

Whenever practicable, officers shall exercise de-escalation techniques to resolve potential use of force incidents and seek voluntary compliance from suspects/subjects. The courts have held that Less-Lethal force options are "capable of inflicting significant pain and may cause serious injury."  Therefore, consistent with the Department's Use of Force Policy, Less-Lethal force options are only permissible when:

**An officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm.**

Less-Lethal force options shall not be used for a suspect or subject who is passively resisting or **merely failing to comply** with commands.  Verbal threats of violence or **mere non-compliance** do not alone justify the use of Less-Lethal force.

An officer may use the 40mm LLL as a reasonable force option to control a suspect when **the suspect poses an immediate threat to the safety of the officer or others.**

Officers shall also consider:

- The severity of the crime versus the governmental interest in the seizure; and
- Whether the suspect was actively resisting arrest or attempting to evade arrest.

The following **do not** alone justify the use of the 40mm LLL:

- Verbal threats of violence
- Mere non-compliance

The 40mm LLL shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized.

Use of Force - Tactics Directive No. 17
40mm Less-Lethal Launcher
Page 2

The 40mm Less-Lethal Launcher may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option.



Officers shall inspect the ammunition and the holder to ensure only 40mm eXact iMpact ammunition is utilized.

## PROCEDURES

The minimum recommended deployment range for the 40mm LLL is five feet, while the effective deployment range is up to 110 feet.  Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a subject/suspect from gaining control of the launcher.  When officers realize the need for a 40mm LLL, they should broadcast, "Code Sam-40."

If tactically and environmentally feasible, the 40mm LLL officer should deploy the launcher from a position of cover with a designated cover officer.  The 40mm LLL officer alerts other officers when he/she is ready to fire by shouting or broadcasting, "40mm Ready!"  The primary officer gives the clear to fire signal by shouting or broadcasting, "40mm, Standby!"  This alerts the officers at the scene that the firing of the 40mm LLL is about to occur.

When firing the 40mm LLL, officers should assess the effectiveness of each round fired.   The effectiveness of the 40mm eXact iMpact round is based on the energy at impact. Therefore, the round may have little or no effect on a subject/suspect who:

- Has a large body mass;
- Is wearing heavy clothing/body armor;
- Is under the influence of drugs; or
- Is in an altered state and cannot feel the impact of the sponge round.

**Tactical Considerations**

- Size of suspect versus size of officer
- Clothing
- Altered mental state (may not be effective)
- Any known history of mental illness
- Age and/or physical condition of the suspect
- Suspect's access to weapons
- Suspect's ability to retreat or escape
- Bystanders' involvement
- Availability of back-up officers (Can suspect be distracted until other units arrive?)
- Background/Foreground (What is behind/in front of the suspect?)
- Officers should maintain distance from the suspect

If shots to the navel area or belt line do not appear to be effective, then a leg, arm or hand may be a viable alternative target.

**If control is not achieved and/or it appears that the 40mm eXact iMpact round is not effective, even after changing target areas, the officers must assess the viability of an alternate force option.**  Additionally, officers should continue to assess the suspect's actions and the effectiveness of each force option used.

Use of Force - Tactics Directive No. 17
40mm Less-Lethal Launcher
Page 3

If officers encounter a self-mutilating or suicidal individual, the use of the 40mm LLL may be a reasonable force option (based on the tactical scenario) to stop his/her actions and afford the individual the opportunity to receive the needed medical treatment.

Generally, officers should not deploy the 40mm LLL at a fleeing suspect.  Officers should pursue and attempt to contain the suspect, while continually assessing the situation and considering the most appropriate tactical plan.  Additionally, officers should avoid deploying the 40mm LLL on individuals who:

- Are on an elevated or unstable surface which could cause a fall that could result in a significant impact injury;
- Are operating or riding any mode of transportation; or
- Are known to be pregnant, under 12 years of age, elderly or visibly frail.

The 40mm LLL is not a substitute for deadly force.  When conducting a building search for a suspect who may be armed, standard firearms must be deployed.  Having a 40mm LLL along with other force options during the search, will provide officers with different options should the situation change.

**Use of Force Warning**

An officer shall, when feasible, give a verbal warning prior to using the 40mm LLL to control an individual.  The warning is not required when an officer is attacked and must respond to the suspect's actions.  Additionally, if a tactical plan requires the element of surprise to stabilize the situation, a warning is not required.  Examples of this would be a hostage situation or a subject threatening suicide.  However, officers are reminded that the surprise/tactical element must still be needed at the actual time the 40mm LLL is fired.

The verbal warning should include a command and a warning of potential consequences of the use of force.  The command should be similar to "drop the weapon" or "stop what you are doing" followed by a warning similar to "or we may use the 40mm, and that may cause you injury."

The use or non-use of the warning shall be documented.  The Non-Categorical Use of Force Report, Form 1.67.05, Use of Force Summary heading shall include:

- The name of the officer giving the warning; and
- An explanation and appropriate justification for not using the warning.

Statements that the "element of surprise was needed" or "for officer safety" reasons will not justify non-use of the warning.  The explanation for non-use must:

- Clearly articulate why the element of surprise was needed;
- Explain in detail any officer safety considerations; and
- List all pertinent reasons that justify why the warning was not provided.

Use of Force - Tactics Directive No. 17
40mm Less-Lethal Launcher
Page 4

The use of the warning, or the reasons for non-use of the warning will be factors considered in the determination whether the use of force was objectively reasonable.

**Tactical Discharges**

Tactical discharges (disabling lights, breaking out windows, etc.) are allowed, but are not recommended, as they may cause secondary, unintended impacts. Before a tactical discharge is used to break a window, officers should consider that an individual may be behind the window and subject to impact by the 40mm round.

Tactical discharges **may** be an effective option in **limited** circumstances. Officers must assess the situation after each tactical discharge, and if the launcher is not producing the desired effect, discontinue its use.  Officers must be prepared to give the rationale behind their decision to fire the 40mm LLL as a tactical discharge.  The reporting procedure for a tactical discharge is the same as a discharge that does not strike a person (Employee's Report, Form 15.07.00).

In the event the 40mm LLL is used for a tactical discharge, it should be communicated to all officers at scene prior to its use, for their situational awareness.

**Reporting**

The use of a 40mm LLL for any reason other than an approved training exercise shall be documented according to established Department procedures on the Non-Categorical Use of Force Report; however, when a 40mm LLL is fired and the round does not strike a person, a use of force report is not necessary and an Employee's Report, Form 15.07.00, should be completed to document the incident. Supervisors shall obtain photographs of all visible and complained of injuries, even when evidence of injury is not present.

**Medical Treatment**

Any person struck with a 40mm eXact iMpact round shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress.  If a medical emergency exists, officers shall request a rescue ambulance to respond to their location.

**DEFINITIONS**

**40mm Less-Lethal Launcher:**  A tactical single-shot launcher configured with a green stock and pistol grip, a rifled barrel, picatinny rail mounting system and Department-approved optics.  The color green is used to signify that the 40mm launcher is for the 40mm eXact iMpact round only.

**Code Sam-40:** The radio code used to broadcast a request for a 40mm LLL.

Use of Force - Tactics Directive No. 17
40mm Less-Lethal Launcher
Page 5

**40mm eXact iMpact Round:**  The 40mm round is a point-of-aim, point-of-impact, direct fire round consisting of a plastic body and a sponge nose that is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.  It can be identified by its silver metal case and blue plastic nose.  These sponge rounds are designed to be non-penetrating, and upon striking a target, distribute energy over a broad surface area.  The sponge round utilizes smokeless powder as the propellant and has velocities that are extremely consistent.

**Tactical Discharge:**  The purposeful discharge at an object to assist officers in a tactical situation, such as to disable lighting or break windows.

**Target Areas:**  The primary target area is the navel area or belt line, but officers may target the suspect's arms, hands or legs when practicable.  If the hand is the selected target, consider its location and what it is holding.  Officers shall not target the head, neck, spine, chest, groin, or kidneys.

---

### Points to Remember

- 5 feet is the minimum deployment range
- Deployment range is from 5 to 110 feet
- Assessment between rounds is critical
- **Do not target the head, neck, spine, chest, groin, or kidneys**
- Reportable use of force if a round strikes a person
- Have a backup plan in the event the 40mm round is ineffective
- 40mm LLL should not be deployed unless lethal force is available for cover
- Form 15.07.00 required when the Launcher is fired and the round does not strike a person, and for tactical discharge

---

### Important Reminder

**Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur.  Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training.  Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.**

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

# EXHIBIT C
# Video Manually Filed



# EXHIBIT D
# Video Manually Filed

