1   GIBSON, DUNN & CRUTCHER LLP          LAUREN M. BLAS, SBN 296823
    ORIN SNYDER (*pro hac vice*)             LBlas@gibsondunn.com
2      OSnyder@gibsondunn.com            JILLIAN N. LONDON, SBN 319924
    KATHERINE MARQUART, SBN 248043           JLondon@gibsondunn.com
3      KMarquart@gibsondunn.com          COURTNEY M. JOHNSON, SBN 324331
    KARIN PORTLOCK (*pro hac vice*)          CJohnson2@gibsondunn.com
4      KPortlock@gibsondunn.com          LENORE H. ACKERMAN, SBN 324995
    LEE R. CRAIN (*pro hac vice*)            LAckerman@gibsondunn.com
5      LCrain@gibsondunn.com             MACKENZIE A. MCCULLOUGH,
    200 Park Avenue                      SBN 324343
6   New York, NY 10166-0193                  MMcCullough@gibsondunn.com
    Tel.: 212.351.4000                   333 South Grand Avenue, Suite 4600
7   Fax: 212.351.4035                    Los Angeles, CA  90071-3197
                                         Tel.: 213.229.7000
8                                        Fax: 213.229.7520
9   MATTHEW S. KAHN, SBN 261679
       MKahn@gibsondunn.com
10  555 Mission Street, Suite 3000
    San Francisco, CA  94105-0921
11  Tel.: 415.393.8200
    Fax: 415.393.8306

12

13  Attorneys for Plaintiff Deon Jones

14

15

16                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
17

18  DEON JONES, an individual,

19              Plaintiff,                **CASE NO.  2:20-cv-11147-SVW-SK**

20       v.                              **FIRST AMENDED COMPLAINT FOR
                                         INJUNCTIVE RELIEF AND**
21  CITY OF LOS ANGELES, a municipal     **DAMAGES**
    entity, CHIEF MICHEL MOORE, LOS
22  ANGELES POLICE DEPARTMENT, a         **DEMAND FOR JURY TRIAL**
    municipal entity, and PETER BUENO,
23
                Defendants.
24

25                                       Judge: Hon. Stephen V. Wilson
                                         Trial Date: March 8, 2022
26

27          Plaintiff Deon Jones by and through his counsel files this Amended Complaint

28  against Defendants, the City of Los Angeles, the Los Angeles Police Department

("**LAPD**"), the Chief of the Los Angeles Police Department, Michel Moore, and LAPD Officer Peter Bueno for violating Mr. Jones' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution and Article I, Sections Two, Three, and Seven of the California Constitution.

## **INTRODUCTION**

1.      For the past 75 years, the struggle for civil rights and racial justice in this country has been fueled by peaceful protest.  All too often, however, that peaceful protest has been met with virulent opposition and sometimes brute force, including acts of violence at the hands of the police.  We recall the horrific scenes from the 1960s of police responding to peaceful protesters demanding racial justice with unthinkable brutality:  police dogs, hoses, whips, billy clubs, tear gas, and other so-called "crowd control" tactics that were deployed to suppress the voices of peaceful civilians at some of the most seminal civil rights demonstrations in history, including on that now infamous bridge in Selma, Alabama.  And we have seen similarly inspiring and heart-wrenching scenes unfold in cities across America as people have taken to the streets to protest the murders of George Floyd, Breonna Taylor, Tamir Rice, and other Black Americans, and to demand an end to racism in this country.

2.      Tragically, we have also witnessed today's protesters, like Plaintiff Deon Jones, met with the same police brutality we saw in the 1960s.  This time they face a more modern and potentially more dangerous weapon—the "rubber bullet."  It was this precise weapon that was fired at Mr. Jones during a protest on May 30, 2020, nearly blinding him and leaving him unable to rejoin the protests and lend his voice to a cause that has always been and continues to be deeply important to Mr. Jones.

Gibson, Dunn & Crutcher LLP




*Selma, Alabama (May 1965)[1]*            *Los Angeles, California (May 2020)[2]*

3.      Mr. Jones is a 30-year-old Black man who lives and works in Los Angeles, California.  He is a performance artist, entrepreneur, and Truman Scholar who has devoted his life and energy to elevating Black voices to the forefront of the American consciousness.  This is intensely personal work for Mr. Jones—as a young Black man growing up in Mississippi, he confronted racism daily.  Among many other indignities and confrontations, every year, Mr. Jones witnessed the Ku Klux Klan host a march down the highway that backed up into his grandmother's house.  Since his youth, Mr. Jones has actively participated in local and national politics to fight the kinds of hateful and oppressive messages the KKK spewed at its rallies.

4.      Mr. Jones has been inspired in his life by many great civil rights leaders, including most notably the late Congressman John Lewis, whom he had the honor of knowing, personally, since he was 16 years old.  Mr. Jones learned many lessons from their times together, including that ordinary people can muster up the courage to stand

---

[1]  Katie Nodjimbadem, The Long, Painful History of Police Brutality in the U.S., Smithsonian Mag. (May 29, 2020), https://www.smithsonianmag.com/smithsonian-institution/long-painful-history-police-brutality-in-the-us-180964098/.

[2]  Josh Cain, Outside Group Will Review Violent LAPD Tactics Used in Recent Protests, L.A. Daily News (July 31, 2020), https://www.dailynews.com/2020/07/30/outside-group-will-review-violent-lapd-tactics-used-in-recent-protesters/.

up, speak up, speak out, and do something when they see injustice, no matter the cost. It was Congressman Lewis' voice among others that rang in Mr. Jones' head in the days following George Floyd's murder, when Mr. Jones decided to participate in the racial justice protests that were flooding the streets of Los Angeles and this country.

5.      On May 30, 2020, Mr. Jones spent the day at a peaceful protest in Los Angeles, California—lending his voice to the voices of thousands advocating for racial justice.  Mr. Jones was at all times unarmed and peaceful as he marched with friends in a peaceful demonstration in West Hollywood.  They cheered, held up signs, and listened to speeches advocating for racial equality.  But as Mr. Jones attempted to leave the protest amidst rising tensions in the crowd, LAPD Officer Peter Bueno, outfitted in riot gear and standing less than twenty feet from him, aimed and fired a rubber bullet at Mr. Jones from close range, striking Mr. Jones in the face just below his right eye.  Mr. Jones turned and ran down a pedestrian alley but soon collapsed onto the sidewalk.  As he fell to the ground, bleeding from his face, the skin peeling away from his cheek bone, and his head ringing, Mr. Jones cried out:  "Why did they do this to me?"

6.      Mr. Jones suffered a fracture and lacerations to his face in addition to other injuries requiring immediate medical attention.  Mr. Jones' ophthalmologist later told him that if the rubber bullet had hit him just millimeters from where he was struck, Mr. Jones could have been blinded or killed.

7.      Mr. Jones' injury did not happen in isolation.  Consistent with LAPD custom and practice, Officer Bueno repeatedly and egregiously violated written LAPD policies on uses of force, crowd control, and use of the 40mm Less-Lethal Launcher during the May 30 protest.  Body-worn video that the LAPD has produced in this case confirms that Officer Bueno and his fellow officers consistently and flagrantly violated the rules designed to protect the safety and well-being of civilians.  Officer Bueno and other officers can be seen aiming their launchers at the heads of peaceful protestors, deploying launchers without warning or justification at protestors who pose no threat,

Gibson, Dunn &
Crutcher LLP

and shooting protestors who were standing on elevated surfaces and faced a serious risk of falling if they were shot.

8.      These officers were not alone.   The LAPD's frequent oppression and mistreatment of peaceful demonstrators at protests has been well-documented.   Videos show LAPD officers attacking and threatening protesters, tasing incapacitated protesters, and otherwise inflicting harm on protesters seeking only to exercise their First Amendment rights to advance the cause of racial justice.   Among its many aggressive tactics, the LAPD has repeatedly and indiscriminately shot Kinetic Impact Projectiles ("**KIPs**") commonly called "rubber bullets," "foamed tipped projectiles," or "less lethal" projectiles (hereinafter, "**Rubber Bullets**")—at large groups of protesters without regard for where they were being aimed.[3]   These violent assaults by the LAPD on crowds of peacefully assembled people have suppressed demonstrators and their messages.   The injuries Mr. Jones and other peaceful protesters sustained on May 30, 2020 are examples of this larger trend.

9.      Rubber Bullets deployed by the LAPD cause far more serious harm than their name suggests.   In fact, the moniker "less lethal" weapon is dangerously misleading. Rubber Bullets cause scores of serious injuries and deaths every year.   In a study analyzing the morbidity and mortality associated with Rubber Bullets from January 1, 1990, to June 1, 2017, researchers found 71% of people struck by KIPs suffered severe injuries, 15.5% of individuals were permanently disabled, and 3% died from their injuries.[4]   Forty-nine percent of all deaths and 82.6% of all permanent disabilities

---

[3]   James Queally, Kevin Rector & Richard Winton, <u>Troubling Videos Capture L.A. Police Violence, Aggression Amid Demonstrations</u>, L.A. Times (June 4, 2020), https://www.latimes.com/california/story/2020-06-04/videos-capture-police-violence-aggression-amid-l-a-protests.

[4]   Rohini J. Haar, Vincent Iacopino, Nikhil Ranadive, Madhavi Dandu & Sheri D Weiser, Death, Injury and Disability from Kinetic Impact Projectiles in Crowd-

observed in the study were due to Rubber Bullet strikes to the head.[5]  Accordingly, while these weapons may be "less lethal" than traditional ammunition, Rubber Bullets are far from harmless and are capable of causing severe permanent injury and death.

10.     The attack on Mr. Jones on May 30, 2020, was unconstitutional under both the U.S. and California Constitutions, and Mr. Jones has suffered grievous harm as a result.  And the LAPD knows it.  During the course of this litigation, Defendants have attempted to stonewall and obstruct Mr. Jones' attempts to learn the true identity of his shooter and the officers involved in the unconstitutional deployment of Rubber Bullets.  Eventually, Defendants could not continue their stonewalling.  They had to produce documents.  And those documents, including videos, established the identity of both the shooter and other officers involved in the unlawful activity during that day.

11.     Just a few weeks ago, Defendants produced in discovery a document the LAPD's Force Investigation Division ("**FID**") generated that set forth its purported conclusions from a sham investigation into Mr. Jones' shooting.  The FID's investigative report makes clear that the LAPD is not interested in coming clean and reporting truthfully to the public.  Instead, the LAPD engaged in a cover-up.  Although the cover-up investigation conclusively found, as it had to given the video evidence, that Officer Bueno fired a Rubber Bullet into the crowd where Mr. Jones was standing at the exact moment he was shot by a Rubber Bullet, the report ended with a striking and disturbing conclusion.  The FID stated that although Officer Bueno fired a Rubber Bullet in the direction of and at Mr. Jones, and although Mr. Jones was struck in the face by a Rubber Bullet at the exact same time, the FID *could not conclude* that the bullet Officer Bueno shot into the crowd while facing Mr. Jones was the bullet that struck and injured Mr. Jones.  Even worse, the FID did not suggest someone else shot the bullet that struck and injured Mr. Jones.  The FID claimed it could not even confirm whether Mr. Jones had

Control Settings: A Systematic Review, BMJ Open (2017), https://bmjopen.bmj.com/content/bmjopen/7/12/e018154.full.pdf.

[5] *Id.*

Gibson, Dunn &
Crutcher LLP

been shot at all.  Instead, and perhaps most disturbing and insulting of all, the report stated that Mr. Jones could have been injured before the May 30 protest, reiterating the theory the lead investigator testified to in his deposition that Mr. Jones may have simply suffered a slip and fall.

12. Mr. Jones suffered no slip and fall:

 

*Mr. Jones after being struck by a Rubber Bullet*

13. The public expects and is entitled to truth and integrity from its law enforcement organizations that citizens pay taxes to support.  Instead, the public gets a sham and cover-up "investigation" that recklessly disregarded the facts and served only to protect the unlawful and unconstitutional acts of its agents.

14. And staggeringly, the sham FID investigation concludes that it lacked enough evidence to show Mr. Jones was shot, despite the fact that Mr. Jones' allegations (and the pictures in this very Amended Complaint) have been publicly available for months.  The FID even has Mr. Jones' original Complaint and social media postings in its file—including the pictures confirming his Rubber Bullet wound—as well as media reports corroborating Mr. Jones' claims.  Yet the report ignores this conclusive evidence. The FID Investigators did not even appear to review Mr. Jones' deposition testimony in this very case.

Gibson, Dunn &
Crutcher LLP

15.     As a result of Defendants' stonewalling in discovery and refusals to tell the truth, Plaintiff needed to expend significant resources over many months of discovery before he had the conclusive proof required to name Officer Bueno as the shooter.  He now has that proof.  The FID report confirms that Officer Bueno was the only officer to fire a Rubber Bullet at the time and location of Mr. Jones' injury.  It therefore confirms Officer Bueno is a proper Defendant to sue in this case.  Now armed with this additional proof, Mr. Jones is moving promptly to amend his Complaint and name Officer Peter Bueno as his shooter.

16.     In sum, Mr. Jones brings this action to recover for his injuries and to hold the LAPD accountable for its unconstitutional conduct and its ensuing coverup.  Mr. Jones also seeks prospective relief to ensure that he and his fellow protesters will be able to exercise their constitutional right to engage in peaceful protest without fearing for their health or safety.  It is time for the LAPD to stop deploying Rubber Bullets to suppress peaceful protests.

17.     The right to protest peacefully, to march, and to petition the government for a redress of grievances is fundamental and cannot be "controlled" or suppressed through arbitrary and unconscionable violence.  This country was born in protest, and the Founders that created our nation inscribed the right to protest into the very first amendment of the Bill of Rights.  As the United States Supreme Court has acknowledged, "'speech to protest racial discrimination is essential political speech lying at the core of the First Amendment.'"  *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 915 (1982) (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979)).  Unless this Court acts now, the LAPD's unconstitutional use of Rubber Bullets to attack, control, and suppress peaceful protest will continue.  This cycle of violence must be stopped.  Peaceful protests must be permitted to continue unabated.  And the LAPD must be held to account for its persistent and egregious assaults on protesters lawfully exercising their constitutional rights.

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction over Mr. Jones' claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to issue declaratory and/or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

19.     This Court has personal jurisdiction over the parties to this action pursuant to the Fourteenth Amendment of the U.S. Constitution as all parties are domiciled within the Central District of California.

20.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and the events giving rise to the claims herein occurred in the Central District of California.

**PARTIES**

21.     Plaintiff Deon Jones is a 30-year-old Black man who lives and works in Los Angeles, California.  He is a performance artist, entrepreneur, and Truman Scholar who has devoted his life and energy to elevating Black voices to the forefront of the American consciousness.  This is intensely personal work for Mr. Jones—as a young Black man growing up in Mississippi, he confronted racism daily.  Among many other indignities and confrontations, every year, Mr. Jones witnessed the Ku Klux Klan host a march down the highway that backed up into his grandmother's house.  Since his youth, Mr. Jones has actively participated in local and national politics to fight the kinds of hateful and oppressive messages the KKK spewed at its rallies.  Mr. Jones worked in then-Vice President Joe Biden's public engagement office, was the national spokesperson for Campaign for Justice, served on the board of Colin Powell's America's Promise Alliance, was named a Harry S. Truman Scholar, and was elected to the Advisory Neighborhood Commission (becoming Washington D.C.'s youngest elected official at the time)—all while in college.  Mr. Jones' commitment to public service did not end at graduation.  He became a Truman-Albright Fellow and worked at Be The

Gibson, Dunn &
Crutcher LLP

Change, an organization focusing on promoting participation in post-graduate service organizations, such as Teach For America.  Mr. Jones also served as the special assistant to the United States Deputy Secretary of Defense for Military Community and Family Policy Col. Robert L. Gordon III, before becoming part of the team comprised of Obama Administration officials that started a non-profit called Opportunity@Work, tasked with operationalizing President Obama's TechHire Initiative, which works to help individuals who often lack college degrees gain the necessary skills to qualify for technical jobs.

22.    Today, Mr. Jones lives and works in Los Angeles as an artist and creative consultant, where—among other endeavors—he has worked with renowned conceptual artist Glenn Kaino on numerous creative projects, including with OWN: The Oprah Winfrey Network on its digital media presence; with actor and activist Jesse Williams on digital projects focusing on Black language and telling the stories of Black people; and with Olympic Gold Medalist Tommie Smith, made famous by his Black Power salute on the podium at the 1968 Olympic Games, to create art that encourages conversations about social justice.  Following Mr. Floyd's killing, Mr. Jones decided to participate in the racial justice protests to further his mission of bringing unheard Black voices to the center of American discourse.

23.    Defendant LAPD is a local government entity and an agency of Defendant the City of Los Angeles.  The City of Los Angeles is liable for the actions of the LAPD. The LAPD is sued in its own right on the basis of its policies, customs, and practices which give rise to Mr. Jones' civil rights claims.

24.    Defendant City of Los Angeles is a municipal corporation duly organized and existing under the Constitution and laws of the State of California.  The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which give rise to Mr. Jones' civil rights claims.

Gibson, Dunn &
Crutcher LLP

25.     Defendant LAPD Chief Michel Moore is, and was at all times relevant to this action, the chief policymaker for the LAPD.  He is sued in both his individual and official capacities.

26.     Defendant Officer Peter Bueno is an agent, servant, and employee of Defendant the LAPD.  Officer Bueno has been an officer of the LAPD for 25 years.  He entered the police academy in 1996, where he trained for seven months before joining the police force.  In those seven months, he and other cadets completed numerous trainings, including those on the use of lethal and non-lethal force, crowd control and management, de-escalation tactics, and weapons deployment.  And in the 25 years since then, he has had opportunities to review LAPD manuals, directives, and policy documents on these and other topics.

27.     During his years with the LAPD, Officer Bueno has been involved in at least one other excessive force incident resulting in civil rights actions against him and the City of Los Angeles.  In 2004, during the arrest of an unarmed and subdued individual, Officer Bueno was filmed kneeing on the subject's midsection while more than five other officers held and handcuffed the suspect.  Despite having eight years of police experience at this point, Officer Bueno willingly violated LAPD use of force policies by striking an individual who had already been detained, was not attempting to escape, and was otherwise incapable of resisting arrest.  After a yearlong investigation of this arrest and associated excessive force allegations, then-LAPD Chief William Bratton recommended that Officer Bueno and other officers be disciplined.  Officer Bueno was suspended for six days without pay.

28.     Bueno is the LAPD officer that fired the Rubber Bullet at Mr. Jones, striking him in the face and causing Mr. Jones' injuries.  He is sued in both his individual and official capacities.

Gibson, Dunn &
Crutcher LLP

11

**FACTUAL ALLEGATIONS**

I.      **George Floyd's Murder at the Hands of the Police Sets Off Protests in Los Angeles and Around the World**

29.     On May 25, 2020, Minneapolis police officer Derek Chauvin murdered George Floyd, an unarmed Black man, by kneeling on Mr. Floyd's neck for eight minutes and 46 seconds, ignoring his repeated pleas and draining the life from his body. The video of Mr. Floyd's murder sparked outrage, heartbreak, and a wave of protests in the United States and abroad that continues today.

30.     Mr. Floyd's murder followed on the heels of several other recent racially charged killings of Black Americans by law enforcement and vigilantes, including the fatal shootings of Ahmaud Arbery, who was shot while jogging, and Breonna Taylor, who was shot by plainclothes officers executing a "no-knock" search warrant in Ms. Taylor's home.  The deaths of Mr. Floyd, Mr. Arbery, and Ms. Taylor are not isolated incidents.  In recent years, Trayvon Martin, Eric Garner, Michael Brown, Sandra Bland, Tamir Rice, Philando Castile, Botham Jean, and countless other Black Americans have suffered similar tragic and senseless deaths, each sparking protests and demonstrations in their own right.

31.     Following Mr. Floyd's murder, large protests broke out in communities across the country, including here in Los Angeles.  Like many Americans, and particularly as a Black man, Mr. Jones was deeply saddened and distressed by Mr. Floyd's murder.  In the days that followed, drawing on his background in politics and social justice, Mr. Jones organized and attended a number of protests in downtown Los Angeles, where demonstrations have been held continuously since.  Together, Mr. Jones and others lent their voices to an enduring movement that started at the Founding of our Nation demanding—at long last—racial justice in America.

## II.     Los Angeles Protesters Face Police Violence on Memorial Day Weekend 2020, Leading to Officer Bueno's Shooting of Mr. Jones

32.     On Friday, May 29, 2020, Mr. Jones joined a protest in Downtown Los Angeles.  At around 5:00 p.m., several hundred individuals set off from City Hall with signs.  Throughout the course of the march, which lasted several hours, the group was blockaded and diverted by LAPD officers in full riot gear.  The police also employed a strategy called "kettling"—an aggressive crowd-control tactic that corrals and traps groups of people by surrounding them with officers and preventing the group from moving.

33.     Later that evening, Mr. Jones and his fellow protesters, including his friend Niara Hill, were kettled by LAPD officers.  After several hours of being trapped in by the police, a lone, nonviolent, and apparently unarmed protester approached a line of LAPD officers and attempted to speak with them.  In response, and without provocation or warning, an LAPD officer shot him at close range with a Rubber Bullet.

34.     The shot caused instant and widespread chaos throughout the crowd. Protesters ran in every direction.  LAPD officers sprayed more Rubber Bullets into the crowd, and the protesters attempted to flee for their safety.  Rubber Bullets struck two of Mr. Jones' friends, including Ms. Hill, who was also trampled by protesters fleeing the LAPD's violent attack.

35.     Concerned for his safety but determined to make his voice heard, Mr. Jones returned to protest the following day.  Mr. Jones was wearing black sweatpants, a denim baseball cap, a light blue face mask, and a jacket from Puma's Power Through Peace collection.  The Puma jacket was designed to commemorate gold medalist Tommie Smith's salute at the 1968 Olympic Games, where he used his moment on the podium to bow his head and raise his fist in silent protest against human rights abuses and discrimination against Black Americans.  The jacket has red stripes along the arms and

Gibson, Dunn & Crutcher LLP

a distinctive logo on the back, consisting of a large white rectangle with the year "1968" and the words "Power Through Peace."[6]





*Front of Puma Jacket*[7]                    *Back of Puma Jacket*[8]

36.     On Saturday, May 30, 2020, Black Lives Matter Los Angeles organized a protest in Pan Pacific Park.  The scene that day was joyful: the crowd was enjoying speeches and chanting, grandparents were playing with their grandchildren, and music played in the background.  *See* Dkt. 4, "Exhibit A – Peaceful Protest in the Park."  Mr. Jones and Ms. Hill arrived around 2:00 p.m., shortly before the speeches in the park came to a close.  Mr. Jones believed that the family-centric atmosphere meant a lower risk of police violence than the night before.  He would soon be proven wrong.

---

[6]  Puma x Power Through Peace T7 Jacket, The One, https://www.theoneinus.com/puma-x-power-through-peace-t7-jacket-578456-01.html?id=28266220 (last visited June 30, 2021).

[7]  *Id.*

[8]  *Id.*

Gibson, Dunn & Crutcher LLP

37.     Mr. Jones marched with the thousands of protesters down Beverly Boulevard to Fairfax Avenue, until the march reached Fairfax Avenue and 3rd Street. There, the protest gathered for its conclusion and final speeches.   Following the conclusion of the Black Lives Matter Los Angeles programming, Mr. Jones marched with the protesters down Fairfax Boulevard, toward Beverly Hills, where they were met with a line of LAPD officers outfitted in full riot gear.  Mr. Jones and Ms. Hill had agreed to stay off of the front lines after their violent experience with the police the night before. Along with other protesters, they moved toward an adjacent parking lot in front of a Trader Joe's to get away from the LAPD officers and start making their way home.

38.     From where Mr. Jones stood in the Trader Joe's parking lot, he could see the protest begin to devolve into a frightening display of LAPD violence.  Officers standing at the front line of the protest at 3rd Street and Fairfax Avenue were beating protestors with batons and shooting Less-Lethal Launchers into the crowd.  At the same time, a second line of LAPD officers had formed in the Trader Joe's parking lot. Officers delivered confusing orders, directing protestors to disperse but simultaneously giving the crowd no avenue to do so.  As they had the previous night, LAPD officers employed the "kettling" tactic to hold protestors, many of whom, like Mr. Jones, were simply trying to leave the protest.

39.     As LAPD officers continued to escalate their efforts to disperse protestors, Mr. Jones attempted to safely exit the parking lot by walking through a pedestrian walkway just west of Fairfax Avenue.  As he made his way across the Trader Joe's parking lot, Mr. Jones felt an LAPD officer's baton strike him across the back while he live-streamed the scene with his phone.  Mr. Jones watched as LAPD officers, including Officer Bueno, continued to kettle the protesters.  They prevented protesters from exiting the parking lot even as other officers struck protestors with batons for failing to comply with dispersal orders.

40.     Just before reaching the pedestrian walkway to leave the scene, at around 3:24 p.m., Mr. Jones paused near a parking kiosk at the east end of the Trader Joe's

parking lot where a small crowd had formed.  Two minutes later, around 3:26 p.m., an individual protestor standing behind Mr. Jones threw a water bottle toward Officer Bueno before ducking away.  The water bottle landed feet to the right of Officer Bueno and did not strike any other officers.

41.     Without pausing to determine who threw the water bottle, Officer Bueno aimed and fired a Rubber Bullet at Mr. Jones from close range, striking him on the right side of his face.  Mr. Jones described the moment of impact as akin to "having [his] face blown off."  His face searing with pain, Mr. Jones ran through the crowd and down the pedestrian alley next to Trader Joe's where he soon collapsed.



*Officer Bueno Aiming His Launcher at Mr. Jones*



*Mr. Jones Running Away from Officer Bueno Through the Crowd*

42.     Ms. Hill found Mr. Jones lying on the ground, bleeding profusely and with skin hanging off of his swollen face.  Mr. Jones was in a daze and repeatedly asked Ms. Hill:  "Why did they shoot me?"  The impact produced an intense ringing in his head that would recur throughout his long recovery process.

## III.   Officer Bueno Repeatedly Violates LAPD Policy During the May 30 Protest

43.     On the morning of May 30, 2020 Officer Bueno reported directly to a staging location in West Los Angeles, as a part of the response to the Protest.  After arriving at the staging area, Officer Bueno was told that he would be a part of Tactical Support Element ("**TSE**") 4, which would be deployed in support of TSE 3's missions

1   to move and control the protestors.  Officer Bueno waited at the staging area along
2   with other members of TSE 4 until TSE 3 requested assistance.  While waiting, one of
3   Officer Bueno's supervisors, Sergeant Hwang, assigned Bueno a 40mm Less-Lethal
4   Launcher.  Prior to May 30, Officer Bueno had been assigned to crowd-control
5   response teams like TSE 4 between 10 and 100 times and had experience carrying the
6   40mm Less-Lethal Launcher.

7          44.    Armed with their Less-Lethal Launchers, Officer Bueno and other
8   members of TSE 4 deployed from the staging area to TSE 3's location about a block
9   from 3rd Street and Fairfax.  Bueno and others in his TSE rode in specially designed
10  LAPD Suburbans outfitted with skids and roof racks to allow a larger number of
11  officers to be transported at one time.  They were outfitted in riot gear.

12         45.    Upon arrival, Officer Bueno's role in the response was that of a cover
13  officer, meaning he was instructed to stay back from any skirmish lines with
14  protestors.  His job, instead, was to ensure the safety of officers at the skirmish line, by
15  covering them if protestors demonstrated an immediate threat to their safety or the
16  safety of others on the scene.  Officer Bueno had been trained on proper deployment of
17  40mm Less-Lethal Launchers when he was assigned this role.

18         46.    Despite his training, during the May 30, 2020 protest, Officer Bueno
19  repeatedly failed to follow basic LAPD procedure with respect to crowd control, use of
20  force generally, deployment of 40mm Less-Lethal Launchers, and body-worn video
21  camera use.  Officer Bueno's misconduct throughout the course of the May 30, 2020
22  protest harmed or endangered peaceful protestors and allowed him to circumvent the
23  LAPD's own accountability measures.

24         47.    By his own count, Officer Bueno shot 22 individuals with his 40mm Less-
25  Lethal Launcher during the May 30, 2020 protest.  His count cannot be confirmed with
26  body worn video footage because he manually turned his body camera off between
27  3:11 p.m. and 3:50 p.m.—*i.e.*, including the critical moments when he shot Plaintiff.
28  However, even without that crucial film, Officer Bueno's body-worn video footage

and the footage of surrounding officers demonstrates that Mr. Jones was only one of many peaceful protestors that Officer Bueno harmed or put in danger on May 30.

48.    As of May 30, 2020, Officer Bueno knew that the only approved target areas for 40mm Less-Lethal Launchers were the abdomen and chest area or thighs or legs.  He was aware that shooting 40mm projectiles at the head, neck, and face was prohibited due to the risk of a concussion or other severe head trauma.  And yet, on May 30, 2020 Officer Bueno routinely aimed his 40mm Less-Lethal Launcher into large crowds of protesters, often targeting the launcher at protesters' faces, necks, and upper bodies.  As 40mm Less-Lethal Launchers do not have a safety to protect against accidental discharge, simply pointing the launcher at these impermissible target areas evinced Officer Bueno's willful disregard for the safety of peaceful protestors.



*Officer Bueno pointing 40mm Less-Lethal Launcher at Protestors*

49.    As of May 30, 2020, Officer Bueno also knew that LAPD policy restricted when 40mm Less-Lethal Launchers could be deployed in the first place.  He was aware that they could only be deployed in a target-specific fashion, when an individual demonstrated an *immediate* threat to the safety of police officers or others.  And yet, Officer Bueno's body camera captures him repeatedly pointing his Less-Lethal Launcher at protestors who are doing nothing more than waving signs, chanting, or yelling—behaviors that he and any reasonable officer would know posed no immediate threats to any officers.

50.     Similarly, Officer Bueno repeatedly pointed his Less-Lethal Launcher directly at individuals standing with their hands up, though he was aware that such a posture did not create a threat sufficient to justify deployment of his weapon.  He was aware that many protestors out on May 30, 2020 were acting peacefully, and his body-worn video footage confirms that none of the individuals with raised hands whom he encountered engaged in anything resembling threatening conduct sufficient to justify deployment of his 40mm Less-Lethal Launcher.

51.     Mr. Jones was also not the only individual whom Officer Bueno struck with a 40mm projectile in violation of LAPD policy.  Around 3:58 p.m., Officer Bueno observed a group of protestors standing on a rooftop across the street from where he stood.  Without making any verbal orders to the protestors or alerting nearby officers, Officer Bueno shot his 40mm Less-Lethal Launcher directly at this group of protestors, striking a Black woman and causing the rest to duck out of sight.  The woman he shot is visible on his body-worn footage standing still in the moments leading up to his deployment.  After the deployment, the woman appears to fall backwards onto the roof of the building.  However, she could have fallen forward and off the building entirely, resulting in serious injury.  It is because of this risk that LAPD policy specifically states that "officers should avoid" deploying 40mm Less-Lethal Launchers at individuals who "[a]re ***on an elevated or unstable surface which could cause a fall that could result in a significant impact injury***."[9]  According to this policy, Officer Bueno's deployment of the 40mm Less-Lethal Launcher at this Black woman was plainly impermissible.

---

[9]  Dkt. 1, Exhibit B at 3.



*Peaceful Protestor Standing on Roof*



*Officer Bueno Pointing 40mm Less-Lethal Launcher at Protestor on Roof*

## IV.   Mr. Jones Suffered Physical and Psychological Trauma and Continues to Have Lasting Injuries

52.   Mr. Jones was transported to the hospital by two strangers, medical students, who stopped to help clean and dress his wounds while he was lying on the ground bleeding from his face.  Upon arriving at the hospital, Mr. Jones learned that he had suffered a laceration to his face that required ten stitches, a closed fracture of his

zygomatic arch and maxilla bone,[10] and a head injury.  Mr. Jones spent over eight hours in the hospital and ultimately incurred over $12,000 in medical bills.

53.    The day after Mr. Jones was struck, he began to experience dizziness.  He would sporadically hear ringing in his head like the sound he heard when he was initially hit.  He also coughed up blood in the days immediately following the shooting.  For weeks Mr. Jones suffered nightmares about his assault and would wake up with the same ringing sensation in his head.

54.    Mr. Jones' ophthalmologist removed his stitches a couple of weeks after the incident.  He advised Mr. Jones that if the projectile had struck him just millimeters to the right, Mr. Jones likely would have been blinded, and if the projectile had struck him just millimeters to the left, the projectile would have hit his temple and Mr. Jones very easily could have been killed.

55.    As of today, over a year since the assault, Mr. Jones must still be cognizant of the risk of further injury.  His ophthalmologist informed him that he would continue to be at heightened risk for a fully detached retina that could lead to blindness if further trauma to the region were ever to occur.  As a result, he was for a time unable to engage in many physical activities for fear of reinjury.

56.    Mr. Jones has worked with various individuals to deal with the mental impacts of the traumatic events he has experienced.  He has also begun to seek formal psychotherapy as well.  While his symptoms come and go, the video of Jacob Blake, an unarmed Black man shot by police in Kenosha, Wisconsin on August 23, 2020, brought back the ringing, nightmares, and trauma for Mr. Jones with renewed force, as have more recent events both in Los Angeles and around the country.  He is also unable to enter a gym to lift weights because the sounds of the weight room bring with them the trauma of May 30, 2020.

---

[10] The zygomatic arch and maxilla bone are bones in the face, located under the cheek and around the eye.

57.     There is no telling when Mr. Jones will be able to once again live his life without fear of reinjury or trauma.  And his doctors have made clear that if he is shot in the face again by another Rubber Bullet, the resulting injury would be even more serious than his first one and would more than likely cause catastrophic damage.

## V.     Apprehensive Protesters Continue to Engage in Peaceful Protests Despite the High Likelihood that the LAPD Will Use Rubber Bullets Indiscriminately as a Crowd Dispersal Tactic

58.     A protest sign from the 1963 March on Washington hangs in the Smithsonian's National Museum of African American History and Culture.  It reads "We Demand an End to Police Brutality Now!"[11]  Tragically, that sign—and its impassioned plea for justice—is needed not only in the museum to educate about the past, but also on the streets of cities throughout America, including right here in Los Angeles.

59.     As Americans find themselves amidst a long overdue rebirth of the movement for racial justice and equality in America, those brave enough to join the fight have once again found themselves targeted with extreme violence by law enforcement. Peaceful protesters in the 1960s were regularly subjected to violence at the hands of police.  Americans are or should be familiar with the horrific scenes of peaceful protesters met with unthinkable police brutality:  police dogs, hoses, whips, billy clubs, tear gas, and other so-called "crowd-control" tactics that were deployed to suppress the voices of peaceful civilians at some of the most seminal civil rights demonstrations in history, including on March 7, 1965, in Selma, Alabama on the now-infamous Bloody Sunday.

60.     Similar scenes now infect recent memory, unfolding in cities across America as people took to the streets to protest the murders of George Floyd, Breonna Taylor, Tamir Rice, and other Black Americans, and to demand an end to racism in this

---

[11]  Nodjimbadem, *supra* note 1.

Gibson, Dunn & Crutcher LLP

country.  In the face of such racism, these protestors were met by twenty-first century versions of the very same police violence.

61.   Those protests continued unabated in the wake of the George Floyd protests. Black Lives Matter LA, for instance, held events to protest police brutality and advocate for racial justice, such as the #JackieLaceyMustGo Neighborhood Walks, where members of the community joined members of Black Lives Matter LA in canvassing neighborhoods in an effort to vote Los Angeles District Attorney Jackie Lacey out of office due to her reluctance to file charges against police officers who have unjustly killed or injured Black people.  Black Lives Matter LA continues planning other activism efforts at its meetings.  They fully expect that the police will continue to employ dangerous crowd-control methods, including Rubber Bullets, at anticipated protests and demonstrations, as the LAPD has yet to show the citizens of the City of Los Angeles that they are capable of doing otherwise.[12]

62.   Following his injury, Mr. Jones wanted to return to the protests but decided not to because he was afraid of being injured again by the LAPD.  In fact, his doctors have told him that if the LAPD shoots him again with Rubber Bullets, the resulting damage could be even more serious than his first wound, as the initial damage has rendered him more vulnerable to suffering catastrophic harm from projectiles or other blunt-force trauma to his face.

63.   Looking ahead, Mr. Jones wishes to be free to exercise his constitutional rights of freedom of speech and association by engaging in upcoming demonstrations and expressive activities, however they may arise, in the City of Los Angeles.  However, Defendants' conduct has made Mr. Jones fear for his safety and caused him concern about the exercise of his constitutional rights.  To be clear:  Mr. Jones is afraid to protest due to the risk that the LAPD may once more inflict unwarranted violence against him

---

[12] Organize, Black Lives Matter L.A., https://www.blmla.org/organize/ (last visited Nov. 3, 2021).

and other protesters.[13]  Mr. Jones is also afraid that he may again be injured by a Rubber Bullet from the LAPD if he chooses to exercise his constitutional rights of freedom of speech and association by engaging in demonstrations.

## VI. Despite Defendants' Ongoing Obstruction and Stonewalling, Plaintiff Is Finally Able to Confirm that Officer Bueno Is the Shooter

64.    From the beginning of this litigation, Mr. Jones made identifying his shooter (originally named as a "Doe" defendant) a top priority.  Despite multiple, clear directives from this Court, *see* Dkts. 45, 54, Defendants refused to cooperate with Mr. Jones' discovery requests that sought documents and video footage critical to finding the shooter.  Mr. Jones' persistence ultimately paid off.  Defendants produced hundreds of hours of body-worn video footage, which Plaintiff's counsel painstakingly reviewed for any and all evidence of the shooting.  This careful analysis led Mr. Jones to believe that Officer Bueno was the shooter.  But in the face of Defendants' dogged denials of Mr. Jones' injury and Officer Bueno's involvement, Mr. Jones continued to pursue evidence that would confirm his belief, including taking a deposition of Officer Bueno.

65.    Officer Bueno's deposition was held on June 23, 2021.  During that deposition, Mr. Jones sought to fully examine Officer Bueno's role in the shooting.  In response, Officer Bueno and his counsel attempted to prevent any reasonable examination.  Counsel repeatedly asserted inapposite objections and tried to cut off testimony to conceal the truth.  But Officer Bueno's responses ultimately shed light on his conduct during the protest and his involvement in Mr. Jones' shooting.  While Officer Bueno dodged admitting any responsibility for the shooting itself, he made several key admissions.  Officer Bueno did not deny that he was in the Trader Joes Parking lot just feet away from Mr. Jones.  He did not deny he was in that parking lot

---

[13] Ronald Brownstein, <u>Democrats Won't Cede the Streets This Time</u>, Atlantic (Sept. 10, 2020), https://www.theatlantic.com/politics/archive/2020/09/how-democrats-are-preparing-post-election-chaos/616255/.

1  at the exact moment Mr. Jones was shot.  He did not deny that he was the only officer
2  with a 40mm Less-Lethal Launcher in that area.  He did not deny that he had shot
3  other individuals that day.  And, he did not deny that in video footage of the shooting,
4  he could hear three discharges of a 40mm Less-Lethal Launcher at the exact moment
5  Mr. Jones was shot.

6  66.  Following Officer Bueno's deposition, Defendants continued to haltingly
7  produce documents pertinent to identifying the Doe shooter, including Officer Bueno's
8  notes regarding his 40mm deployments on May 30, 2020. Originally Defendants
9  produced these notes in an illegible form.  Only after Plaintiff's dogged objections did
10  Defendants agree to produce these critical notes in legible form—notes that confirmed
11  just how many times Officer Bueno shot peaceful protesters on May 30, 2020:  a
12  staggering 22, not counting those discharges that were not captured by his body-worn
13  video camera.  Defendants similarly promised a report from their internal
14  investigations into the shooting.  Originally, they promised the report would be
15  produced in August 2021.  But they delayed and stonewalled further, failing to produce
16  the first of those documents until October 15, 2021.

17  67.  Defendants have disclosed to Plaintiff that two internal LAPD
18  departments have been "investigating" Mr. Jones' shooting—the Internal Affairs
19  Group ("**IAG**") and the FID.  The IAG "acts as the investigative arm of the Chief of
20  Police (COP) with respect to employee misconduct," and is "responsible for
21  investigating the more serious complaints of misconduct."[14]  While Defendants have
22  claimed that the IAG has yet to complete its investigation, Defendants have stated that
23  a report will be available by December 8, 2021—over a year and a half after Officer
24  Bueno shot Mr. Jones.

25

26

27

---

28  [14]  Internal Affairs Group, LAPD, https://www.lapdonline.org/internal_affairs_group
(last visited June 29, 2021).

1    68.    The FID's investigation is apparently done.  But the report is staggering in

2    its shamelessness.  Instead of attempting to find the truth, the report confirms that the

3    FID's sham investigation conducted by lead investigator Detective Brad Michel was

4    designed to promote a cover-up, with the ultimate predestined conclusion being that

5    Mr. Jones' claims were "unsubstantiated."  The report shirks the FID's responsibility

6    to get to the truth—let alone justice—by refusing to adopt the only reasonable

7    conclusion supported by the evidence:  Officer Bueno shot Mr. Jones.

8    69.    Specifically, even though Detective Michel began his investigation in

9    February of 2021 and even though he was responsible for only *one* investigation,

10   Detective Michel's investigatory approach was inadequate and superficial.  Detective

11   Michel failed to review most body-worn video footage from officers at the scene.  In

12   fact, he only reviewed key footage that showed Officer Bueno shooting Mr. Jones *after*

13   Plaintiff identified Officer Bueno in that footage.  Detective Michel also failed to

14   conduct even a preliminary investigation on Mr. Jones' claims months after this

15   litigation was filed.  He conceded that he had not read the original Complaint filed in

16   this case, nor is there any indication that he *ever* read Mr. Jones' deposition testimony.

17   Next, Detective Michel only learned that Officer Bueno had been previously

18   disciplined for use of force during his deposition in this case.  Even months into his

19   purported sham investigation he had not conducted a basic background check into

20   Officer Bueno and his disciplinary history, claiming instead that Officer Bueno's

21   disciplinary history would not be relevant to the FID's investigation.  In this sense,

22   Detective Michel acted more like Officer Bueno's defense counsel than his prosecutor.

23   Likewise, Detective Michel failed to investigate whether Officer Bueno's excessive

24   use of force may have been racially motivated, and admitted that he has never

25   concluded that *any* use of force by an LAPD officer was racially motivated.

26   70.    The FID's final report is even more transparent in its attempt to cover up

27   the truth.  The report admits that "Officers Bueno and Purece were both armed with

28

40mm less-lethal launchers" at the time Mr. Jones was shot.[15]  But "*only Officer Bueno appeared to discharge less lethal munitions during that time period*."[16]  And yet, the report ultimately finds the body-worn video inconclusive, stating, "Despite the fact that *Officers Bostillo, Rivera, Amores, and Purece's BWV's captured Officer Bueno's positioning with the less lethal launcher, the audible discharge of the less lethal launcher*, and various perspectives of the crowd throwing objects at Officers Bueno and Mia; none of the BWV's captured Jones being struck by an officer's baton or a less lethal munition."[17]  Ignoring all evidence to the contrary—including the very photographs in Mr. Jones' original Complaint that are in the FID's own file—the FID report grasps for other causes for Mr. Jones' injury.  The lead investigator in fact testified that Mr. Jones could have suffered a slip and fall.

71.     To further this ruse and evade its own investigatory obligation, the FID blames Mr. Jones for the FID's investigative cover-up.  It claims his failure to speak with FID investigators obstructed the FID's ability to determine the cause of his injuries.  Yet the FID's final report demonstrates that the FID investigators had access to photos of Mr. Jones' injury in both the Complaint and copies of social media posts.[18]  Nor is there any indication that FID investigators ever reviewed Mr. Jones' deposition transcript from this case.  If they wanted to ask him questions, they only needed to ask defense counsel what to ask.  The FID did not want for information, it simply wanted an excuse.

72.     The FID's staggeringly inept sham investigation confirms the LAPD's tendency to protect its officers at all costs, even against the citizens the LAPD claims to protect.  The FID's report is textbook obfuscation.  It confirms that Officer Bueno

---

[15]  FID Rep. at 7.

[16]  *Id.* at 7 (emphasis added).

[17]  *Id.* at 10–13 (emphasis added).

[18]  *See supra* p. 6.

shot Mr. Jones yet refuses to state that conclusion.  The report's failings only corroborate unconstitutional infirmities that pervade the entire Department from FID on down.

**VII.** **The LAPD's Unlawful Practices and Policies and the Lack of Training Allowed Officer Bueno and Other LAPD Officers to Use Violent Force Indiscriminately as a Crowd-Dispersal Tactic Including Against Mr. Jones**

**A.** **The LAPD's Longstanding Custom and Practice Puts Peaceful Protestors at Risk of Serious Harm**

73.     The LAPD purports to follow written policies when using force, but its practices and customs diverge significantly from those policies.  The LAPD ostensibly operates under the Policy on the Use of Force (the "**Policy**"), which is an official policy approved by the Board of Police Commissioners providing rules regarding the LAPD's use of force.  The Policy is supplemented by "**Tactics-Directives**," which contain details on specific aspects of the Policy and are incorporated into the Policy.

74.     "Rubber Bullets" are 40mm Exact Impact kinetic, hard foam-tipped projectiles.  Officers fire them from the 40mm "less lethal" launcher, which is essentially a modified shotgun.  Pursuant to the 40mm Tactics-Directive, officers are allowed to use "less lethal" weapons against a crowd, but *only* when an officer determines that an individual suspect is actively resisting arrest or attempting to evade arrest.  Moreover, the Policy acknowledges that "less lethal" uses of force are capable of inflicting serious injury, and therefore reiterates that the use of "less lethal" weapons is permissible *only* when an officer reasonably believes that a suspect is violently resisting arrest or poses an immediate threat of violence or physical harm.  According to the Policy, "less lethal" force options *shall not be used* against a suspect who is passively resisting or failing to comply with commands."[19]  Further, the 40mm Less-Lethal Launcher may only be used

---

[19]  Dkt. 1, Exhibit B at 1.

in crowd-control situations against a single subject in an individualized, target-specific fashion.[20]

75.     In addition, the Tactics-Directive requires that officers "shall, when feasible, give a verbal warning prior to using the 40mm LLL to control an individual," which "should include a command and a warning of potential consequences of the use of force."[21]   In addition, it provides that "use of a 40mm LLL for any reason other than an approved training exercise shall be documented according to established Department procedures on the Non-Categorical Use of Force Report. . . .   Supervisors shall obtain photographs of all visible and complained of injuries, even when evidenced of injury is not present. . . .   Any person struck with a [40mm round] shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress."[22]

76.     In its "Points to Remember" section, the Tactics-Directive reiterates: "**Do not target the head, neck, spine, chest, groin, or kidneys**."[23]   The 40mm Tactics-Directive also states that the 40mm "less lethal" launcher weapon "***shall not be used to target the head, neck, face, eyes or spine***."[24]   In practice, however, the LAPD takes no precautions with respect to where it aims these weapons, and officers fire them indiscriminately at the torsos and heads of the people of this City whenever they are gathered in large crowds, and in the case of Mr. Jones, directly at his face from a close range.[25]

---

[20]  *Id.*

[21]  *Id.*

[22]  *Id.* at 4.

[23]  *Id.* at 5.

[24]  *Id.* at 1 (emphasis added).

[25]  Kevin Rector, <u>One Man's Eye 'Exploded,' Another Lost Eight Teeth from LAPD</u>

Gibson, Dunn &
Crutcher LLP

77.     In fact, the LAPD has developed a practice and custom of using "less lethal" weapons against a subject who is ***not*** subject to arrest, ***not*** violently resisting arrest, and is ***not*** posing an immediate threat of violence or physical harm to officers, themselves, or other individuals.  Instead, as accounts from the George Floyd protests in Los Angeles reveal, LAPD officers spray Rubber Bullets indiscriminately into crowds of protesters, seemingly with no specific target in mind.  The LAPD's indiscriminate use of "less lethal" weapons against protesters is a routine practice.

78.     The LAPD has a long history of misusing Rubber Bullets.[26]  It deployed Rubber Bullets as early as 1992 in response to protests sparked by the brutal beating of Rodney King by LAPD officers.[27]  The LAPD used Rubber Bullets again in August 2000 to forcibly break up protests outside the Democratic convention, blinding at least one woman.[28]  Then, in May 2007, the LAPD deployed Rubber Bullets against crowds at the MacArthur Park Protests calling for amnesty for undocumented immigrants.  The LAPD used Rubber Bullets again in October 2011 during the Occupy Los Angeles protests.[29]

---

Projectiles Fired at Lakers Revelers, L.A. Times (Oct. 15, 2020), https://www.latimes.com/california/story/2020-10-15/lapd-projectiles-gruesome-injuries-lakers-celebration.

[26] Joel Rubin, LAPD Violence Against George Floyd Protests Erodes a Decade of Reforms, L.A. Times (June 14, 2020), https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics.

[27] Dean E. Murphy, Rubber Bullets Pass LAPD Test: Police Officers Used New 'Knee Knockers' to Disperse Crowd.  Officials Say the Non-lethal Munitions Appear to be Working Well, L.A. Times (Dec. 17, 1992), https://www.latimes.com/archives/la-xpm-1992-12-17-me-2994-story.html.

[28] Rubin, *supra* note 26.

[29] *Id.*

Gibson, Dunn &
Crutcher LLP

79.    The LAPD has used this tactic time and again against peaceful protesters, like Mr. Jones, who were exercising their constitutional rights.[30]   At the George Floyd protests in May and June of 2020, as explained above, the LAPD were not employing Rubber Bullets to incapacitate any one individual resisting arrest or for any lawful purpose.   Rather, the LAPD sprayed Rubber Bullets into a crowd to punish protesters for their political speech and to deter similar expressions of constitutionally protected speech.

80.    Sadly, Mr. Jones' injuries are not unique.   Reports of protesters suffering fractured skulls, lost eyes, and other serious injuries from Rubber Bullets have become routine since protests began in Los Angeles last summer.[31]   For example:

> a) On May 30, 2020, at the same protest, 28-year-old Eric Schuh was struck in the mouth by a Rubber Bullet while trying to help someone in

---

[30] Donovan Slack, Dennis Wagner, Kevin McCoy & Jay Hancock, Police Use of Rubber Bullets, Bean Bag Rounds has Left a Bloody Trail for Decades, USA Today (July 24, 2020), https://www.usatoday.com/in-depth/news/nation/2020/07/24/rubber-bullets-less-lethal-weapons-victims-police-protesters-decades/5410519002/; Maeve Reston & Joel Rubin, L.A. to Pay $13 Million to Settle May Day Melee Suits, L.A. Times (Feb. 5, 2009), https://www.latimes.com/archives/la-xpm-2009-feb-05-me-lapd-settlement5-story.html; Associated Press, LAPD Video Shows Protester With Hands Up Shot in Head by Rubber Bullet, NBC L.A. (Aug. 2, 2020), https://www.nbclosangeles.com/news/local/lapd-video-protester-hands-up-shot-in-head-by-rubber-bullet/2406184/.

[31] See, e.g., Liz Szabo, Jay Hancock, Kevin McCoy, Donovan Slack & Dennis Wagner, Fractured Skulls, Lost Eyes: Police Often Break Own Rules Using 'Rubber Bullets', USA Today (June 19, 2020), https://khn.org/news/rubber-bullets-protesters-police-often-violate-own-policies-crowd-control-less-lethal-weapons/; Knvul Sheikh & David Montgomery, Rubber Bullets and Beanbag Rounds Can Cause Devastating Injuries, N.Y. Times (June 12, 2020), https://www.nytimes.com/2020/06/12/health/protests-rubber-bullets-beanbag.html.

the crowd who had fallen.[32]  The projectile snapped off one of his teeth, cracked several others, and busted his lip open.

    b) Also on May 30, 2020, at the same protest, Tina Crnko was struck in the left bicep, ribcage, and forehead by Rubber Bullets.[33]  The impact caused temporary hearing loss and extreme pain.  Crnko's forehead injury required seven stitches, and she still suffers from nerve damage.

    c) Also on May 30, 2020, at the same protest, Randy Stewart was struck on the back of the head by a Rubber Bullet.[34]  He suffered a traumatic brain injury, a brain hemorrhage, blurred vision, difficulty speaking, and PTSD.

    d) On June 2, 2020, Ben Montemayor, a 28-year-old filmmaker, was hit by a Rubber Bullet in Hollywood.  Mr. Montemayor was struck in the groin causing one of his testicles to swell to twice its usual size and forcing him to undergo immediate emergency surgery.[35]

---

[32] Kevin Rector, Soumya Karlamangla & Richard Winton, <u>LAPD's Use of Batons, Other Weapons Appears to Violate Rules, Significantly Injuring Protesters, Times Review Finds</u>, L.A. Times (June 11, 2020), https://www.latimes.com/california/story/2020-06-11/lapd-violated-protocols-for-batons-and-less-lethal-bullets-injuring-many-protesters.

[33] First Amended Complaint, Black Lives Matter Los Angeles v. City of Los Angeles, No. 2:20-cv-05027-CBM-AS (June 21, 2020).

[34] Parris Law Firm, <u>R. Rex Parris Serves $50 Million Government Claim on Behalf of Peaceful Black Lives Matter Protester Severely Injured by Rubber Bullet</u>, PR Newswire (July 9, 2020), https://www.prnewswire.com/news-releases/r-rex-parris-serves-50-million-government-claim-on-behalf-of-peaceful-black-lives-matter-protestor-severely-injured-by-rubber-bullet-301091187.html.

[35] Kevin Rector, <u>Video Shows LAPD Officer Shooting Protester in Groin at Close Range</u>, L.A. Times (Sept. 19, 2020), https://www.latimes.com/california/story/2020-09-19/video-shows-lapd-officers-protesters-shoot-him-in-groin.

e)  On October 11, 2020, 22-year-old William Gonzalez was hit in the eye with a Rubber Bullet shattering his eye socket, ripping apart his tear duct, and exploding his eyeball when he was out celebrating the L.A. Lakers' NBA title win outside the Staples Center.[36]  He is now permanently blind in his right eye.

f)  Also on October 11, 2020, during that same incident, one of the LAPD's Rubber Bullets struck 25-year-old Manny Barrientos in the mouth.[37]  He lost eight teeth and suffered a severe injury to his lip.

g)  In March 2021, the LAPD responded to nonviolent protests over the removal of a homeless encampment in Echo Park with the deployment of Rubber Bullets.  Officers were "captured on video using the weapons in ways that appeared to violate the department's policies."[38]

h)  On July 17, 2021, the LAPD responded to peaceful protest by trans rights activists with the deployment of Rubber Bullets.  Footage depicts officers apparently shooting beanbag rounds at protesters from less than

---

[36]  Rector, *supra* note 25 ("He will never see out of his right eye and will probably need to have it removed to avoid the threat of losing vision in his good eye through a phenomenon known as sympathetic ophthalmia—a process by which the immune system begins to attack both eyes if one is traumatized beyond repair and remains in the body.").

[37]  Sareen Habeshian & Chris Wolfe, Man Says He Lost 8 Teeth, Chunk of Lower Lip When LAPD Rubber Bullet Hit Him Amid Lakers Championship Celebration, CBS42 (Oct. 14, 2020), https://www.cbs42.com/news/u-s-world/man-says-he-lost-8-teeth-chunk-of-lower-lip-when-lapd-rubber-bullet-hit-him-amid-lakers-championship-celebration/.

[38]  Kevin Rector, 'It Stood Out to Me as Egregious': Protesters, Others Allege LAPD Violence at Echo Park Sweep, L.A. Times (Mar. 30, 2021), https://www.latimes.com/california/story/2021-03-30/protesters-others-allege-lapd-violence-at-echo-park-protests.

Gibson, Dunn & Crutcher LLP

33

five feet away and firing rounds from the 40mm launcher at protestors attempting to flee the scene.[39]

81.     Defendants therefore have a demonstrated custom of authorizing excessive force by the LAPD against peaceful protesters engaged in constitutionally protected conduct.   Indeed, the LAPD has acknowledged that its officers consistently and historically commit unlawful and violent acts against peaceful protesters and that LAPD line and command staff do not receive adequate training on proper law enforcement conduct and procedures at public demonstrations.   For example, the Settlement Agreement arising from *Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D. Cal. 2007)—a case brought to challenge police brutality by the LAPD at the May Day protests in MacArthur Park in 2007—included a $12,850,000 payment to individuals and a Structural Relief Order establishing guidelines for LAPD officers' conduct toward protesters to preserve protesters' First Amendment rights.[40]  This directive was only necessary because the LAPD could not, or would not, train its own officers to perform their duties in a constitutional manner. The recurrence of the same constitutional violations over a decade later reveals the LAPD's intentional and institutional refusal to preserve the constitutional rights of protesters.

82.     Since the Settlement Agreement in *Multi-Ethnic Immigrant Workers Organizing Network*, the LAPD has continuously failed to adequately train its officers and command staff in, among other things, the rights of demonstrators, lawful crowd control, dispersal orders, separating those engaged in unlawful conduct from those

---

[39]   Robert Mackey, <u>As Transphobes Rally Again at Los Angeles Spa, Police Attack Counterprotesters</u>, The Intercept (July 18, 2021), https://theintercept.com/2021/07/18/transphobes-rally-los-angeles-spa-police-attack-counterprotesters.

[40]   Settlement Agreement, Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles, No. CV 07-3072 AHM, 2009 WL 9112416 (C.D. Cal. June 24, 2009).

engaged in lawful conduct, the permissible use of "less lethal" weapons in crowd-control situations, and the permissible use of force and circumstances justifying the use of force in crowd-control situations.[41]   This failure amounts to deliberate indifference by the LAPD to the rights of persons its officers are sworn to serve and protect, and demonstrates the LAPD's intention ***not*** to properly train its law enforcement personnel.

### B.   Officer Bueno and Other LAPD Officers' Excessive Force Followed LAPD Custom and Practice and Evinced a Complete Disregard for Protester Safety

83.   The LAPD's violent attacks on peaceful protesters have only gotten worse. Specifically, on May 28, 29, and 30 of 2020 (and beyond), the LAPD has deployed "less lethal" weapons on protesters, and has continued to deploy "less lethal" weapons against peaceful demonstrators and crowds.  Disturbing videos documenting the indiscriminate nature of the LAPD's use of Rubber Bullets are readily available online.  *See* See Dkt. 4, "Exhibit C – Protestor Shot in the Head with Rubber Bullet," and "Exhibit D – Protestor Shot in Groin with Rubber Bullet."  These videos reveal that the LAPD has tacitly and explicitly authorized the indiscriminate use of "less lethal" weapons on crowds of protesters at demonstrations on these dates, protesters like Mr. Jones.  The LAPD, acting pursuant to its plainly unconstitutional custom and practice, unlawfully used "less lethal" weapons against Mr. Jones and many others, as alleged above.  In fact, during the May 30, 2020 protest, LAPD officers consistently antagonized protestors in order to then justify officers' uses of force, deployed weapons without warning or

---

[41]   Indeed, instead of investing in training to protect the lives of Angelenos, in 2015 the LAPD invited Dave Grossman, a retired Army Ranger, to conduct a training for over six hundred officers on what he calls "killology": a concept designed to aid police officers to kill in the line of duty with less hesitation and teaches that "killing is just not that big of a deal" in the line of duty.  Kelly McLaughlin, One of America's Most Popular Police Trainers is Teaching Officers How to Kill, Insider (June 2, 2020), https://www.insider.com/bulletproof-dave-grossman-police-trainer-teaching-officers-how-to-kill-2020-6.

allowing sufficient time for protestors to comply with their orders, and used force beyond what was necessary in order to carry out their directives.

84.     On May 30, 2020, LAPD officers were generally violent, combative, and used excessive force to push protestors on the front lines of the protest.  At the intersection of 3rd Street and Fairfax Avenue, a crowd of peaceful protestors had formed and stood chanting and holding signs.  Officers yelled at these protestors to back up despite protestors in the front having no way to move, given the size and concentration of the crowd behind them.  Many protestors communicated these constraints to officers and asked for more time to comply as they waited for the crowd to make room for dispersal.  Instead of waiting or providing alternative dispersal routes, officers wildly swung and jabbed their batons, senselessly beating protestors and shoving them to the ground.  Body-worn video footage from officers in TSEs 3 and 4 reveals shockingly violent encounters between officers of all ranks present at the protest, including supervising Sergeants.

85.     These violent actions were captured alongside often violent words on body-worn video footage.  At one point, an officer asks a supervisor, Sergeant Hwang, whether a path for egress should be created.  He responds: "they don't get to leave."  Sergeant Hwang is also captured violently hitting protestors with his baton.  Officer Garcia, also equipped with a baton, not only encouraged other officers to be physically violent with protestors, but himself constantly swung his baton at and knocked down protestors.  At one point, Officer Garcia tells another officer "make sure you strike hard okay, don't pitter patter."  In his body-worn video footage, Officer Rivera tells a small, female protestor "I don't want to hurt you" and then shortly thereafter jabs her in her stomach, causing her to fall into other protestors.  Officer Rodriguez, who stood in front of a particularly dense group of protestors, forcefully beat protestors with his baton despite there being little room to disperse and at one point repeatedly jabbed and pushed a small, female protestor stuck against a police cruiser.

86.     Officers equipped with 40mm Less-Lethal Launchers in TSEs 3 and 4 repeatedly violated LAPD policy and risked the safety of numerous peaceful protestors.  Officer Arias on multiple occasions pointed his launcher at face level into a crowd of protestors and shot directly into the crowd even when protestors pleaded with him not to shoot and were unable to disperse due to the number of people behind them. Similarly, Officer Dameworth shot his launcher directly into a dense crowd at shoulder or head level, causing one woman to exclaim "Officer Dameworth, using extreme force."

87.     Officers equipped with 37mm Less-Lethal Launchers were similarly aggressive and violated LAPD use of force policy on multiple occasions.  Officers Martin, Ramirez, and Jimenez in TSE 3, among others, indiscriminately shot their launchers at protestors without warning, with no clear strategic plan for dispersal, and without any immediate threat from protestors.  In his body-worn video footage, Officer Martin is seen encouraging other officers to "push them" and "jab them" while a protestor screams "I have nowhere to go."  Instead of providing any direction or response besides yelling "leave the area," Officer Martin then deploys a stream of 37mm rounds into the crowd, including at protestors in the process of dispersing.  In the Activity Log maintained by Lieutenant Jenal on behalf of TSE 3, Officer Martin is noted to have deployed *150 rounds* of 37mm baton rounds during the protest, whereas other officers in his unit deployed no more than 70 rounds.

88.     Meanwhile, confusion appeared to reign.  Body-worn video footage captures Officer Dameworth asking "Whose idea was this?" and adding "You guys are nuts.  This is not cool."  Officer Phillips also questions his supervisor, Sergeant Hwang, asking "Why are we doing this, Sarge?"  He later adds, "This is crazy." Similarly Officer Atteberry asks "Hey, why the fuck are we out here like this?"

89.     The breadth of these incidents, combined with the LAPD's staggering history of police brutality against protesters, including with Rubber Bullets, confirms that Officer Bueno's shooting of Mr. Jones was not an isolated incident but rather part

1    and parcel of Defendants' unconstitutional customs and practices.  Defendants have been

2    unable or unwilling to prevent LAPD officers' improper use of "less lethal" weapons

3    and thus have in effect authorized, made, and therefore ratified the decision to attack

4    peaceful protesters, including Mr. Jones.

5         **C.    An Independent Report Commissioned by the City Found that the**

6              **LAPD Failed to Adequately Train or Supervise Officers to Deploy**

7              **Rubber Bullets**

8         90.    On June 30, 2020, the Los Angeles City Council requested that retired

9    LAPD commander Gerald Chaleff conduct an inquiry into the LAPD's crowd-control

10   tactics and compliance with Department policies during the 2020 George Floyd

11   protests.  He released his report (the "**Chaleff Report**") on March 10, 2021.[42]  The

12   Chaleff Report detailed endemic problems throughout the LAPD and specifically

13   noted inadequate training, lack of supervision, and misuse of "less lethal munitions,"

14   including 40mm and 37mm rounds.  The report further confirms the longstanding and

15   egregious custom and practice that resulted in Officer Bueno shooting Mr. Jones.

16        91.    The Chaleff Report began by criticizing the LAPD's inadequate training.

17   Staggeringly, the report noted that the LAPD offered only a two-hour training session

18   for officers to deploy Less-Lethal Launchers.  During that training, trainees fired the

19   launcher "only a few times at a stationary target."[43]  Not only was this training clearly

20   inadequate, but it had been offered to only new recruits since 2018.[44]  The report

21   contrasted this inadequate training with the high level of marksmanship and skill

22   necessary to "competently deploy" the 40mm launcher in crowd-control situations.[45]

_____

42   Attached hereto as Exhibit A.

43   Ex. A at 8.

44   *Id.* at 45.

45   *Id.* at 62.

Tellingly, prior to 2017, only personnel certified and trained frequently to deploy the 40mm launcher were allowed to do so in crowd-control situations.[46]

92.     The Chaleff Report also found a stark lack of supervision over the deployment of these dangerous weapons.  Nearly all of the commanding officers interviewed for the report said "that their level of training and experience was limited prior to these events, and that they did not feel confident in handling these incidents."[47] This is consistent with the report's finding that the "deployment of less lethal munitions was not always done at the direction of a supervisor or officer"; this included instances where officers were positioned in the front of skirmish lines equipped with less lethal weapons, including the 40mm launcher, with no direction or coordination from superiors.[48]

93.     The Chaleff Report specifically concludes that the failure to properly train or supervise LAPD officers resulted in the troubling deployment of these weapons during the 2020 protests.  Video review revealed multiple "instances where officers quickly fired the 40mm rounds at distant targets which increases the likelihood of hitting an unintended target."[49]  This misuse had serious consequences—the report found that a majority of the reported injuries sustained by protestors were a result of 40mm launcher deployments.[50]  This is unsurprising considering the indiscriminate overuse of these weapons.  Inventory records, Chaleff explained, show nearly 10,000 rounds of less lethal munitions were not returned to the LAPD armory after the

_____

[46] *Id.* at 8.

[47] *Id.* at 36.

[48] *Id.* at 61–62.

[49] *Id.* at 44.

[50] *Id.*

protests.[51]  But the LAPD was either unable or refused to provide numbers regarding the number of munitions used during the protests.[52]

94.    In sum, the Chaleff Report highlighted the immense problems surrounding the LAPD's use of Rubber Bullets, as well as the Department's failure to adequately respond to previous lawsuits and settlements related to civil rights violations against protesters.[53]  Despite ongoing scrutiny, policy changes, and legal action, the LAPD has continuously failed to properly train or supervise officers using less lethal munitions in protest situations, resulting in abuse and injury.

**D.    Policymaking Officials Have Ratified Defendants' Unconstitutional Custom and Practice and Failed to Adequately Respond to Reports of Violence Against Peaceful Protestors**

95.    Chief Moore directly ratified the decision to use "less lethal" weapons against protesters on May 30, 2020.  In an effort to justify, defend, and condone the violent LAPD response to protesters, Chief Moore blamed the crowd, stating in a news conference on Monday, June 1, 2020:  "We didn't have protests last night.  We had criminal acts.  We didn't have people mourning the death of this man, George Floyd, we had people capitalizing.  His death is on their hands, as much as it is those officers."[54]

96.    Chief Moore and officials of the City of Los Angeles also have a sufficiently senior role such that their decisions may fairly be said to represent official policy of the City of Los Angeles and the LAPD.  Chief Moore and those same officials

---

[51] *Id.* at 43 (noting that "over 3,500 rounds of 40mm and over 6,200 rounds of 37mm munitions were not returned to the [LAPD] armory").

[52] *Id.*

[53] *Id.* at 16–17.

[54] Richard Winton, Cindy Chang & Benjamin Oreskes, <u>LAPD Chief Michel Moore's Comments on Looters Create Political Firestorm</u>, L.A. Times (June 3, 2020), https://www.latimes.com/california/story/2020-06-03/lapd-chief-moores-comments-on-looters-create-political-firestorm-even-after-he-apologized.

of the City of Los Angeles chose to condone the use of "less lethal" weapons against protesters, including Mr. Jones.  Chief Moore is the highest authority within the LAPD, and has knowledge of both the continuous and indiscriminate use of "less lethal" weapons against protesters and the failure to effectively train officers as alleged above. Therefore, the decision to use "less lethal" weapons was effectively made by official policymakers and Chief Moore.

97.    On June 2, 2020, Los Angeles Mayor Eric Garcetti announced that he directed the LAPD to "minimize" the use of Rubber Bullets when dealing with peaceful protestors, stating that, "I think that we've seen less of any of those tactics and I hope that we can see the most minimal if not zero of those tactics."[55]

98.    On April 20, 2021, Chief Moore issued an update to the LAPD's Rubber Bullet policy in response to a federal court order, imposing a moratorium on the use of the 37mm launcher and reiterating Department policy on the use of the 40mm launcher.[56] A week later, the LAPD revised the order, reinstating the 37mm launcher so long as it is fired at the ground.[57]  These changes highlight Chief Moore's ability to shape LAPD Rubber Bullet policy.

99.    However, the LAPD has not explained how the revised policy differs from the previous policies that the Department had failed to abide by, nor how the Department

---

[55] Lauren Lyster, LAPD Directed to 'Minimize' Use of Rubber Bullets Against Peaceful Protestors, Garcetti Says, KTLA5 (June 2, 2020), https://ktla.com/news/local-news/lapd-directed-to-minimize-use-of-rubber-bullets-against-peaceful-protestors-garcetti-says/.

[56] Kevin Rector, LAPD Halts Use of Some Projectile Weapons at Protests After Court Ruling, L.A. Times (Apr. 20, 2021), https://www.latimes.com/california/story/2021-04-20/lapd-halts-use-of-certain-projectile-weapons-at-protests.

[57] Jonah Valdez, Reversing Course, LAPD Will Now Allow Officers to Use Some Less-Lethal Projectiles During Protests, L.A. Daily News (Apr. 29, 2021), https://www.dailynews.com/2021/04/29/reversing-course-lapd-will-now-allow-officers-to-use-some-less-lethal-projectiles-during-protests/.

plans to sufficiently train officers before arming them with these weapons.  If the past is any predictor of the future, policy does not equate to practice and more sweeping change will be needed to ensure the safety of protestors seeking to exercise their constitutional rights.    Simply put, over several *decades*, the LAPD has proven itself entirely untrustworthy in using purportedly "less lethal" weapons.    No matter how comprehensive its policies claim to be, LAPD custom and practice is indiscriminate, brutal, excessive, and consistently unconstitutional use of force.

**VIII.  Studies Show Rubber Bullets Can Cause Severe Injury, Permanent Disability, and Death**

100.    A 2016 joint study by Physicians for Human Rights ("**PHR**") and the International Network of Civil Liberties Organizations ("**INCLO**") found that KIPs, which include Rubber Bullets, "cause serious injury, disability, and death."[58]  The study noted that, "while KIPs are sometimes described as 'less lethal' than conventional ammunition, the number of deaths, serious injuries, and permanent disabilities that they can cause in a crowd-control setting is of serious concern. . . . These factors call into question the appropriateness of these projectiles for crowd-control purposes."[59]  The study concluded that "KIPs should never be fired at close range and should never be targeted at the head or other vital areas of the body, where impact typically causes serious injury and, in many instances, death."[60]

101.    A 2017 study published in the medical journal *BMJ* found that KIPs have caused "serious injury, disability and death."[61]  This study identified 1,984 people who

---

[58]  Rohini J. Haar & Vincent Iacopino, Lethal in Disguise: The Health Consequences of Crowd-Control Weapons 30 (2016), https://phr.org/wp-content/uploads/2018/09/lethal-in-disguise.pdf.

[59]  *Id.* at 35.

[60]  *Id.* at 94.

[61]  Haar et al., *supra* note 4, at 7.

had been injured by KIPs, "53 of whom died as a result of their injuries. Among those injured, 71% had injuries that were considered severe and 300 people suffered permanent disabilities."[62]  Notably, "[p]ermanent disabilities and severe injuries often resulted from strikes to the head and neck (48% of deaths and 87% of permanent disabilities)."[63]  The study concluded that "[g]iven the inherent inaccuracy of KIPs, risk of serious injury or death and potential for deliberate misuse, our findings suggest that KIPs do not appear to be an appropriate means of force in crowd-control settings."[64]

102.   A 2020 PHR report noted that "KIPs are generally considered 'less-lethal,' although the lethality of a KIP depends greatly on the way it is used. . . . [D]eployment of KIPs can result in life-threatening injury, permanent disability, and death.  These risks are greatly exacerbated when KIPs are misused; guidelines published by manufacturers and law enforcement agencies unanimously agree that *KIPs should never be aimed at the head* when lethal force is not indicated."[65]

103.   UN guidance on the use of KIPs provides: "Targeting the face or head may result in skull fracture and brain injury, damage to the eyes, including permanent blindness, or even death.  The firing of kinetic impact projectiles from the air or from an elevated position, such as during an assembly, is likely to increase their risk of striking protesters in the head.  Targeting the torso may cause damage to vital organs,

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 8.

[65] Physicians for Human Rights, Shot in the Head, Story Maps (Sept. 14, 2020), https://storymaps.arcgis.com/stories/29cbf2e87b914dbaabdec2f3d350839e (emphasis in original).

and there may be penetration of the body, especially when projectiles are fired at close range."[66]

104.   A fact sheet put together by PHR and INCLO discusses the health effects of KIPs, particularly with regard to head, face, and neck injuries:

a) "Blunt trauma to the brain can cause concussions and bruising inside the brain (contusions) as well as different types of bleeding in the brain (intracranial hemorrhage) and skull fractures.  KIPs have also been known to penetrate the skull or enter the brain tissue, causing hemorrhage, injury to the spinal cord, and severe brain injury from the foreign body."[67]

b) "The delicate structures of the face and neck are particularly vulnerable to traumatic injury.  The bones of the face and skull, the spinal cord, and the blood vessels in the neck are all close to the skin surface."[68]

c) "Direct trauma to the eye from KIPs nearly always causes total blindness in that eye due to rupture of the globe (eyeball) as well as trauma to nearby structures.  KIPs can also penetrate through the eye socket and enter the brain, causing brain injury."[69]

105.   The same fact sheet concluded: "*KIPs in general are not an appropriate weapon for crowd managements* and, specifically, for dispersal purposes.  Most cannot

---

[66]   Office of the United Nations High Commissioner for Human Rights, Guidance on Less-Lethal Weapons in Law Enforcement 35–36 (2020), https://www.ohchr.org/Documents/HRBodies/CCPR/LLW_Guidance.pdf.

[67]   PHR & INCLO, KIP Fact Sheet, https://www.inclo.net/pdf/lethal/KIPfactsheet.pdf (last visited Nov. 3, 2021).

[68]   *Id.*

[69]   *Id.*

be used effectively and safely against crowds.  At close ranges, levels of lethality and patterns of injury of some KIPs become similar to those of live ammunition.  At longer ranges, KIPs are inaccurate and indiscriminate.  Some KIPs are lethal in close range and ineffective at longer distances which make safe use difficult."[70]

106.   In a 2021 letter to the editor of the New England Journal of Medicine, physicians and researchers at the University of Minnesota Medical School noted that, throughout the George Floyd protests, "law enforcement used less-lethal weapons as a method of crowd control despite evidence of associated injuries and death."[71]  The study identified ten patients in two Minnesota hospital systems alone who sustained eye trauma from projectiles and sixteen patients who received traumatic brain injuries.[72]  In addition, the study noted that "[a] substantial percentage of projectile injuries were to the head, neck, or face (in 23 of 57 patients [40%])."[73]  The study concluded that "[a]lthough less-lethal weapons are designed as an alternative to lethal weapons, we found a substantial number of patients with serious injuries, including many injuries to the head, neck, and face. . . . [T]hese findings reveal that under current practices, projectiles are not appropriate for crowd control."[74]

---

[70]  *Id.* (emphasis in original).

[71]  Erika A. Kaske et al., Injuries from Less-Lethal Weapons During the George Floyd Protests in Minneapolis, Letter to the Editor, New England J. of Medicine, 774–75 (Feb. 25, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2032052.

[72]  *Id.*

[73]  *Id.*

[74]  *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT I

### Violation of First Amendment to The United States Constitution

### (42 U.S.C. § 1983)

107.   Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

108.   Defendants' decision to shoot Mr. Jones with a Rubber Bullet violates the First Amendment in at least five ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of the right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; (iv) as unconstitutional content- and viewpoint-based discrimination; and (v) as a violation of Mr. Jones' right to record matters of public interest.

109.   Defendants have adopted municipal policies, practices, and customs that have caused the violations complained of herein; and, in the alternative, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

110.   Chief Moore and officials of the City of Los Angeles elected to use "less lethal" weapons against protesters and Mr. Jones, have knowledge of the indiscriminate use of "less lethal" weapons against protesters, and have nonetheless failed to effectively train officers as alleged above.

111.   Mr. Jones' rights to assemble, protest, and demonstrate peaceably are all protected activities under the First Amendment of the United States Constitution.  As the U.S. Department of Justice stated recently, "First Amendment protection is at its apex when citizens seek to engage in core political speech in a traditional public forum." Brief for the United States as *Amicus Curiae* Supporting Appellants and Urging Vacatur, *Givens v. Newsom*, No. 20-15949, 2020 WL 3393978, at *13 (9th Cir. June 10, 2020).

112.   Defendants acted under color of State law when they deprived Mr. Jones of his rights to assemble, protest, and demonstrate peaceably by shooting him in the face with a Rubber Bullet.

113.   Defendants' use of force against Mr. Jones and other similarly situated protesters was substantially motivated by the protesters' and Mr. Jones' engagement in First Amendment protected activity, constituted an effort to deter future similar activity, and evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

114.   The above-described conduct was, and continues to be, a proximate cause of Mr. Jones' enduring pain and suffering and has chilled his desire to participate in future protests.  These violations of the First Amendment are also continuing and causing irreparable harm.

## COUNT II

### Violation of Fourth Amendment to The United States Constitution
### (42 U.S.C. § 1983)

115.   Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

116.   Mr. Jones was seized by Defendants when Defendants' officers intentionally, by kettling and through the use of force and Rubber Bullets, terminated his freedom of movement.

117.   Defendants acted under color of State law when Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

118.   Mr. Jones did not commit a crime.

119.   Mr. Jones did not pose a threat to Defendants or any of their officers or agents or any other person.

120.   Mr. Jones' Fourth Amendment rights were violated when he was deliberately targeted and shot with Rubber Bullets during the course of his lawful protest.

121.   Mr. Jones fears further retaliation in the future in violation of the Fourth Amendment if he continues to observe, record, or participate in constitutionally protected activity.

122.   As a direct and proximate result of Defendants' unlawful actions, Mr. Jones endured pain and suffering.   These violations of the Fourth Amendment are also continuing and causing irreparable harm.

## COUNT III

### Violation of Fourteenth Amendment to The United States Constitution
### (42 U.S.C. § 1983)

123.   Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

124.   Defendants acted under color of State law when they decided to forcibly disperse Mr. Jones by using Rubber Bullets, thereby violating Mr. Jones' Fourteenth Amendment right to due process.

125.   Mr. Jones has protected First Amendment liberty interests in the right to assemble, protest, and demonstrate peaceably.

126.   Mr. Jones has a right to not be subject to excessive force in the context of engaging in this expressive First Amendment activity.

127.   By violently attacking unarmed protesters engaged in expressive conduct, Defendants have engaged in conduct that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and therefore that conduct constitutes excessive force in violation of the Due Process Clause of the Fourteenth Amendment.

128.   As a direct and proximate result of Defendants' unlawful actions, Mr. Jones endured pain and suffering.   These violations of the Fourteenth Amendment are also continuing and causing irreparable harm.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**

**Freedom of Speech Under the California Constitution**

**(Article I, Section 2 of California Constitution)**

129. Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

130. Defendants' decision to forcibly disperse Mr. Jones by using Rubber Bullets violates Mr. Jones' rights under Article I, Section 2 of the California Constitution.

131. In California "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art. 1, § 2.

132. "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1167 (9th Cir. 2007).

133. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

134. The above-described conduct was a proximate cause of harm to Mr. Jones.

135. Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 2 of the California Constitution.

**COUNT V**

**Freedom of Assembly Under the California Constitution**

**(Article I, Section 3 of California Constitution)**

136. Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

137. In California "[t]he people have the right to . . . assemble freely to consult for the common good." Cal. Const. art. 1, § 3.

138.    Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

139.    The above-described conduct was a proximate cause of harm to Mr. Jones.

140.    Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 3 of the California Constitution.

## COUNT VI

### Due Process Under the California Constitution

### (Article I, Section 7 of California Constitution)

141.    Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

142.    In California, "[a] person may not be deprived of life, liberty, or property without due process of law."  Cal. Const. art. 1, § 7.

143.    Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

144.    The above-described conduct was a proximate cause of harm to Mr. Jones.

145.    Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 7 of the California Constitution.

## COUNT VII

### Search and Seizure Under the California Constitution

### (Article I, Section 13 of California Constitution)

146.    Mr. Jones re-alleges and incorporates by reference the preceding paragraphs of this complaint.

147.    In California, "[the] right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated."  Cal. Const. art. 1, § 13.

148.   Mr. Jones has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from deploying Rubber Bullets against protesters.

149.   The above-described conduct was a proximate cause of harm to Mr. Jones.

150.   Mr. Jones seeks only declaratory and injunctive relief, not damages, for the violation of his rights under Article I, Section 13 of the California Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Jones respectfully requests from this Court:

(1)   A permanent injunction barring Defendants from engaging in the unconstitutional conduct of using Rubber Bullets, and imposing appropriate remedial measures to prevent the repetition of such conduct in the future as the Court deems necessary;

(2)   A declaratory judgment that Defendants' conduct complained of herein was a violation of Mr. Jones' rights under the Constitution and laws of the United States;

(3)   A declaratory judgment that Defendants' conduct complained of herein was a violation of Mr. Jones' rights under the California Constitution;

(4)   General, compensatory, and punitive damages for Mr. Jones for the violations of his federal constitutional and statutory rights—but not for any violation of his rights under the California Constitution—all to be determined according to proof;

(5)   An award of attorneys' fees pursuant to 42 U.S.C. § 1988;

(6)   Costs of suit;

(7)   Pre- and post-judgment interest as permitted by law; and

(8)   Such other and further relief as the Court may deem just and proper.

Gibson, Dunn &
Crutcher LLP

51

1    Dated:  November 12, 2021          GIBSON, DUNN & CRUTCHER LLP

2                                                  By:  */s/ Katherine Marquart*

3                                                         Katherine Marquart

4                                                         Attorney for Plaintiff

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiff demands trial by jury on all issues so triable.

3

4
Dated:  November 12, 2021

5

6

7
By: */s/ Katherine Marquart*

Katherine Marquart

8
Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28